SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Plaintiff,

v.

The PENNSYLVANIA PUBLIC UTILITY COMMISSION, Defendant.

National Railroad Passenger Corporation, Plaintiff,

v.

The Pennsylvania Public Utility Commission, Glen Thomas, Chairman, Pennsylvania Public Utility Commission, Robert K. Bloom, Vice Chairman, Pennsylvania Public Utility Commission, Aaron Wilson, Jr., Commissioner, Pennsylvania Public Utility Commission, Terrence J. Fitzpatrick, Commissioner, Pennsylvania Public Utility Commission, Defendants.

Civil Action Nos. 95–4500, 01–5570.

United States District Court, E.D. Pennsylvania.

July 12, 2002.

Vincent J. Walsh, Southeastern Pa. Transp. Auth., Philadelphia, PA, David P. Bruton, Drinker Biddle & Reath LLP, Philadelphia, PA, for Southeastern Pa. Transp. Auth.

Ronald P. Schiller, Piper, Marbury, Rudnick & Wolfe, LLP, Philadelphia, PA, Joseph Kernen, Piper, Marbury, Rudnick & Wolfe, LLP, Philadelphia, PA, Elizabeth J. Feeney, Piper, Marbury, Rudnick & Wolfe, LLP, Philadelphia, PA, Daniel J. Layden, Piper, Marbury, Rudnick & Wolfe, LLP, Philadelphia, PA, John L.

Moore, Piper, Marbury, Rudnick & Wolfe, LLP, Washington, D.C., for National R.R. Passenger Corp.

Susan D. Colwell, Penn. Public Utility Com'n, Harrisburg, PA, for Southeastern Pa. Transp. Auth., National R.R. Passenger Corp.

Benjamin C. Dunlap, Jr., Craig J. Staudenmaier,Dennis E. Boyle, Nauman Smith Shissler & Hall, Harrisburg, PA, for Norfolk Southern Railway Co.

### *MEMORANDUM*

DuBOIS, District Judge.

## TABLE OF CONTENTS

I. BACKGROUND ..................................................695
 A. THE STATUTORY EXEMPTION AND PUC'S COST–ASSESSMENT AUTHORITY ..................................................695
 B. CASSATT AVENUE BRIDGE PROCEEDINGS ..........................696
 C. INITIAL SEPTA PROCEEDINGS ...................................697
 D. THE SEPTA CONSENT DECREE...................................698
 E. PUC'S EFFORTS TO VACATE THE CONSENT DECREE ..............699
 F. LLOYD STREET BRIDGE PROCEEDINGS ...........................700
 G. CURRENT PROCEEDINGS BEFORE THIS COURT ...................702

II. NORFOLK SOUTHERN'S MOTIONS TO INTERVENE .....................703
 A. INTERVENTION AS OF RIGHT ....................................703
 B. PERMISSIVE INTERVENTION ....................................705

III. SEPTA'S MOTION TO ENFORCE THE CONSENT DECREE ...............706
 A. JURISDICTIONAL ISSUES: YOUNGER AND ROOKER–FELDMAN.....706
 B. CONFLICTING FEDERAL AND STATE COURT JUDGMENTS ..........707
 1. Res Judicata and Enforcement of the Consent Decree ...................707
 2. Analysis of PUC's Counter Arguments ..............................710
 a. Waiver of res judicata defense ...................................710
 b. SEPTA's permissible avoidance of state court litigation ..............711
 c. Preservation of judgments under the All Writs Act ..................712
 C. RELIEF—SEPTA ...............................................714

IV. PUC'S MOTIONS TO DISMISS AMTRAK'S COMPLAINT .................715
 A. ELEVENTH AMENDMENT SOVEREIGN IMMUNITY .................715
 B. EFFECT OF THE COMMONWEALTH COURT'S JUDGMENTS .........716
 C. FAILURE TO JOIN NECESSARY PARTIES .........................717
 D. DECLARATORY JUDGMENT ACT REQUIREMENTS...................718
 E. ABSTENTION ................................................719
 F. INJUNCTIVE RELIEF AGAINST PUC COMMISSIONER AARON WILSON, JR .................................................721
 G. DISPOSITION OF PUC MOTIONS ................................721

V. AMTRAK'S MOTIONS FOR DECLARATORY AND INJUNCTIVE RELIEF...................................................721
 A. LIKELIHOOD OF SUCCESS ON THE MERITS ......................723
 B. IRREPARABLE HARM TO AMTRAK ..............................725
 C. HARM TO PUC ...............................................727
 D. PUBLIC INTEREST ...........................................727
 E. RELIEF—AMTRAK...............................................728

VI. CONCLUSION .................................................728

These related cases present important questions of federalism concerning state courts' treatment of the final judgments of federal courts. Specifically, the cases raise the issue of how a litigant who has obtained a final federal judgment in its favor can enforce that judgment when a final order of a state court directly contradicts the earlier final federal order.

The underlying issue is an oft-litigated question: whether PUC may allocate to SEPTA and Amtrak a share of the cost of maintaining and constructing highway bridges over railroad rights of way in the Commonwealth of Pennsylvania notwithstanding a federal statute exempting SEPTA and Amtrak from the payment of a "tax, fee, head charge, or other charge" imposed by a local taxing authority.[1] In a series of decisions issued during the past fifteen years, judges of this Court have uniformly decided that federal statutory law exempts Amtrak and SEPTA from paying such costs. The Third Circuit has, in all instances, affirmed these decisions.

Despite this long line of decisions, Pennsylvania state courts have issued opinions directly contradicting the federal courts' rulings. The precise question now presented is whether Amtrak and SEPTA may continue to enforce the federal court judgments in their favor in the face of a state court's conflicting interpretation of federal statutory law. As this Court now holds, the answer to that question is undeniably "yes."

In reaching this decision, the Court addresses seven pending motions. In the SEPTA case, No. 95–4500, there are two pending motions: Motion of SEPTA to Enforce the Consent Decree and Supporting Memorandum of Law (Doc. Nos. 20 and 21, filed Oct. 23, 2001); and Norfolk Southern's Motion to Intervene as Intervenor/Defendant (Doc. No. 24, filed Dec. 4, 2001).

In the Amtrak case, No. 01–5570, there are five pending motions: Motion of the PUC to Dismiss the Verified Complaint in Equity filed by Amtrak (Doc. No. 6, filed Dec. 18, 2001); Motion of Commissioner Aaron Wilson, Jr., to Dismiss the Verified Complaint in Equity filed by Amtrak (Doc. No. 7, filed Dec. 18, 2001)[2]; Norfolk Southern's Motion to Intervene as Intervenor/Defendant and Supporting Memorandum of Law (Doc. Nos. 8 and 9, filed Dec. 21, 2001)[3]; Motion of Amtrak for Preliminary and Other Injunctive Relief (Doc. No. 12, filed Jan. 2, 2002); and Amtrak's Renewed Motion for Declaratory Judgment and for Preliminary and Permanent Injunction (Doc. No. 22, filed May 8, 2002).[4]

For the reasons stated in this Memorandum, the Court will: (1) deny Norfolk Southern's Motions to Intervene; (2) grant SEPTA's Motion to Enforce the Consent Decree; (3) deny PUC's Motions to Dismiss; and (4) grant Amtrak's Motions for Declaratory and Injunctive Relief to the extent Amtrak seeks preliminary injunctive relief.

---

1. For purposes of this Memorandum, the parties will be identified as follows: Southeastern Pennsylvania Transportation Authority: "SEPTA"; National Railroad Passenger Corporation: "Amtrak"; Pennsylvania Public Utility Commission and all individual defendants: "PUC"; and Norfolk Southern Railway Company: "Norfolk Southern."

2. The Court will refer to PUC's Motion to Dismiss and Commissioner Wilson's Motion to Dismiss collectively as "PUC's Motions to Dismiss."

3. The Court will refer to Norfolk Southern's Motions to Intervene in both cases collectively as "Norfolk Southern's Motions to Intervene."

4. The Court will refer to Amtrak's two motions as "Amtrak's Motions for Declaratory and Injunctive Relief."

## I. *BACKGROUND*

Since 1986, the parties now before the Court have litigated a number of cases,[5] all of which have involved the allocation of costs for the maintenance and construction of highway bridges over railroad rights of way throughout Pennsylvania.[6] Because the history of this litigation is essential to disposition of the pending motions, the Court now sets forth that history in some detail.

## A. THE STATUTORY EXEMPTION AND PUC'S COST–ASSESSMENT AUTHORITY

In 1982, Congress enacted a statute aimed at protecting Amtrak, a federally owned and funded entity, from having to finance railway-related improvements which would otherwise be financed by state and local governments and other entities.[7] That statute, as amended, provides, in relevant part:

> Amtrak, a rail carrier subsidiary of Amtrak, and any passenger or other customer of Amtrak or such subsidiary, are

---

**5.** The long history of litigation between these parties has resulted in a number of reported decisions under the same captions. Specifically, in this Memorandum, the Court cites to five different decisions entitled *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n* and eight different decisions entitled *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*. The Court here lists those citations in chronological order and provides short citation forms (e.g., *SEPTA I*) for each decision. Throughout the text of this Memorandum, the Court will reference these cases by short citation:

| | |
|---|---|
| SEPTA I | *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 140 Pa. Cmwlth. 270, 592 A.2d 797 (Pa. Commw.Ct.1991), alloc. denied, 531 Pa. 642, 611 A.2d 714 (Pa. 1992) |
| SEPTA II | *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 140 Pa. Cmwlth. 292, 592 A.2d 808 (Pa. Commw.Ct.1991), alloc. denied, 531 Pa. 642, 611 A.2d 714 (Pa. 1992) |
| SEPTA III | *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 802 F.Supp. 1273 (E.D.Pa.1992) (Pollak, J.) |
| SEPTA IV | *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 826 F.Supp. 1506 (E.D.Pa.1993) (Pollak, J.) |
| SEPTA V | *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, No. Civ. A. 95–4500, 1999 WL 639946 (E.D.Pa. Aug.23, 1999) (DuBois, J.) |
| Amtrak I | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 665 F.Supp. 402 (E.D.Pa.1987) (Newcomer, J.) |
| Amtrak II | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 848 F.2d 436 (3d Cir.1988), cert. denied, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 220 (1988) |
| Amtrak III | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, No. Civ. A. 86–5357, 1991 WL 993 (E.D.Pa. Jan.4, 1991) (Newcomer, J.) |
| Amtrak IV | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, No. Civ. A. 86–5357, 1997 WL 587278 (E.D.Pa. Sept.10, 1997) (Newcomer, J.) |
| Amtrak V | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, No. Civ. A. 86–5357, 1997 WL 597963 (E.D.Pa. Sept.15, 1997) (Newcomer, J.) |
| Amtrak VI | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, No. Civ. A. 86–5357, 1998 WL 103377 (E.D.Pa. Feb.23, 1998) (Newcomer, J .) |
| Amtrak VII | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 159 F.Supp.2d 28 (E.D.Pa.2001) (Newcomer, J.) |
| Amtrak VIII | Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 288 F.3d 519 (3d Cir.2002) |

**6.** Hereinafter, the Court's references to "highway bridges" denote bridges that cross railroad rights of way.

**7.** For a more detailed history of the enactment of the statute and the policies motivating Congress' action, see *SEPTA V*, 1999 WL 639946, at *1–2; *SEPTA III*, 802 F.Supp. at 1278–79; and *Amtrak I*, 665 F.Supp. at 404–05.

exempt from a tax, fee, head charge, or other charge, imposed or levied by a State, political subdivision, or local taxing authority on Amtrak, a rail carrier subsidiary of Amtrak, or on persons traveling in intercity rail passenger transportation or on mail or express transportation provided by Amtrak or such a subsidiary, or on the carriage of such persons, mail, or express, or on the sale of any such transportation, or on the gross receipts derived therefrom.

49 U.S.C. § 24301($l$)(1) ("statutory exemption").[8] In 1988, Congress enacted further legislation extending the exemption to commuter authorities like SEPTA, providing that they are exempt "from paying a tax or fee to the same extent Amtrak is exempt." 49 U.S.C. § 24301(f). Under this federal statutory scheme, both Amtrak and SEPTA are therefore "exempt from a tax, fee, head charge, or other charge, imposed or levied by a State, political subdivision, or local taxing authority." 49 U.S.C. § 24301($l$)(1).

In Pennsylvania, PUC is vested with the authority to assess costs for maintaining highway bridges, and, *inter alia*, to impose those costs on railroads. *See Amtrak I,* 665 F.Supp. at 403 (detailing PUC's statutory authority to assess costs for maintaining highway bridges). In determining how it will assess costs—that is, to what entities it will allocate costs—PUC considers a number of factors, including the "benefit a party receives from a crossing." *Bell Atl.- Pa., Inc. v. Pa. Pub. Util. Comm'n,* 672 A.2d 352, 355 (1995). PUC and Pennsylvania's courts have recognized that railroads which own rights of way running underneath highway bridges derive a benefit from those bridges. *See Pittsburgh &*

*Lake Erie R.R. Co. v. Pa. Pub. Util. Comm'n,* 124 Pa.Cmwlth. 611, 556 A.2d 944, 946 (1989). Those benefits include the avoidance of liability caused by accidents and concomitantly reduced insurance costs, as well as the elimination of any need to pay for and maintain crossing signals. *Id.*

Because Amtrak and SEPTA both either own or use railroad rights of way throughout the Commonwealth of Pennsylvania, and thus benefit from highway bridges transversing those rights of way, PUC has, on several occasions during the past two decades, sought to impose costs for the maintenance of those bridges on Amtrak and SEPTA. Amtrak and SEPTA have argued, however, and judges of this Court have agreed, that the statutory provisions exempting them from paying a "tax, fee, head charge, or other charge, imposed or levied by a State, political subdivision, or local taxing authority" prevent PUC from allocating such costs to exempted entities like Amtrak and SEPTA. The Court will now summarize the proceedings in which this issue was addressed.

## B. CASSATT AVENUE BRIDGE PROCEEDINGS

On May 30, 1986, PUC assessed to Amtrak costs involved in the replacement of a bridge in Tredyffrin Township carrying Cassatt Avenue over an Amtrak-owned right of way. Amtrak then brought suit in this Court, arguing that PUC's assessment to Amtrak violated the statutory exemption. Although PUC agreed that Amtrak was exempt from taxes, it argued that the phrase "taxes" did not encompass the costs it had assessed to Amtrak. *See Amtrak I,* 665 F.Supp. at 408.

Judge Newcomer rejected PUC's argument in *Amtrak I.*[9] Explaining that "[t]he

---

8. This provision was formerly codified at 45 U.S.C. § 546b, but, as part of a recodification of the United States Code, was moved to its current location in the Code. All references to the statute in this Memorandum will use the current citation.

9. He also rejected PUC's argument that a federal court should give res judicata effect to PUC's assessment orders. *See Amtrak I,* 665 F.Supp. at 406–08.

common sense understanding of taxation to include any involuntary exaction to support a governmental entity or purpose is consistent with the intent of Congress expressed in the statute," *id.* at 410, he concluded that the statute "exempts Amtrak from the payment of special assessments such as that imposed by PUC." *Id.* at 412. Accordingly, Judge Newcomer permanently enjoined PUC from levying on Amtrak a tax "for design, construction or maintenance of the Cassatt Avenue bridge structures." *Id.*

PUC appealed Judge Newcomer's decision to the Third Circuit, and that court affirmed in *Amtrak II.* In so doing, the Third Circuit defined the "precise issue" for consideration as "whether the phrase 'any taxes or other fees' contained in th[e] statute covers charges of the nature levied against Amtrak for building and maintaining the Cassatt Avenue bridge." *Amtrak II,* 848 F.2d at 438. Substantially agreeing with Judge Newcomer's analysis, the court explained that "[t]he statute's text, its legislative history, and analogous caselaw persuade us to give the exemption ... a broad interpretation that fulfills the intent of Congress." *Id.* at 440. Because it would be "manifestly inconsistent" to compel Amtrak to "pay for related local improvements in the many instances where the states could, and would, impose them," the court held "that Amtrak's immunity from local 'taxes or other fees'... extends to assessments for local improvements of the kind at issue here." *Id.*

## C. INITIAL SEPTA PROCEEDINGS

Notwithstanding the decisions in *Amtrak I* and *Amtrak II,* PUC continued to assess highway bridge maintenance costs to SEPTA. The Commonwealth Court affirmed these assessments in two decisions conflicting with the rulings in *Amtrak I*

and *Amtrak II.* Concluding that PUC's assessments of costs to SEPTA for maintenance of highway bridges did not constitute "taxes" as that term is used in the statutory exemption, the Commonwealth Court held the assessments permissible. *SEPTA II,* 592 A.2d at 810; *SEPTA I,* 592 A.2d at 803–04.

In 1992, SEPTA brought an action in this Court, seeking a ruling that, like Amtrak, it was entitled to the protection of the statutory exemption. SEPTA sought this relief with respect to four bridges. *SEPTA IV,* 826 F.Supp. at 1511.[10] Although PUC raised numerous arguments in opposition to SEPTA's requested relief, the most relevant for present purposes involve PUC's arguments aimed at distinguishing SEPTA's case from the earlier Amtrak decisions—all of which Judge Pollak rejected in *SEPTA IV.*

First, PUC argued that the language of the exemption statute did not extend Amtrak's tax immunity to SEPTA. Judge Pollak rejected this argument and held that SEPTA was in fact covered by the statutory exemption. *Id.* at 1522–24. Second, PUC rehashed the argument asserted in the Amtrak cases that the costs imposed for highway bridge maintenance were not "taxes." Again, Judge Pollak rejected this argument, finding no reason to distinguish the case from the Third Circuit's decision in *Amtrak II. Id.* at 1524–26. *See also SEPTA III,* 802 F.Supp. at 1281 (Judge Pollak's earlier decision examining in more detail and rejecting PUC's arguments as to scope of "taxes" covered by statutory exemption).

Upon finding the costs assessed to SEPTA undistinguishable from those ruled impermissible in *Amtrak II,* Judge Pollak ordered that "any assignment of costs to

---

**10.** For a more extensive discussion of the procedural history in this SEPTA case, see

*SEPTA III,* 802 F.Supp. at 1276–79 (denying defendants' motion to dismiss).

SEPTA by order of [PUC] for costs associated with design, construction, maintenance, inspection, or repair of" the four bridges at issue would be in violation of the statutory exemption "as a tax or other fee levied upon SEPTA." *SEPTA IV,* 826 F.Supp. at 1526. Additionally, Judge Pollak permanently enjoined PUC from "assessing such tax or other fee" regarding the four bridges, and from enforcing such assessment orders against SEPTA. *Id.* at 1526–27. The Third Circuit affirmed without opinion, and PUC's petition for certiorari was denied. *Southeastern Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n,* 27 F.3d 558 (3d Cir.), *cert. denied,* 513 U.S. 928, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994).[11]

## D. THE SEPTA CONSENT DECREE

Even after PUC exhausted its appeals of Judge Pollak's decision, PUC continued to assess highway bridge maintenance costs to SEPTA. Given these continued assessments, in 1995, SEPTA filed a second action in this Court. That action is presently before the Court.

In its Complaint, SEPTA sought much broader relief than that obtained before Judge Pollak, requesting an injunction preventing PUC from assessing against SEPTA "any costs associated with the design, construction, maintenance, inspection or repair" of one particular bridge, the Woodland Avenue bridge, "or *any other* bridges carrying highways over SEPTA commuter rail lines." SEPTA Doc. No. 1 at 1 (emphasis added).[12]

In 1995, shortly after SEPTA filed its Complaint, the Commonwealth Court of Pennsylvania issued an opinion concerning highway bridge cost assessments and the statutory exemption. In contrast to its 1991 decisions discussed *supra,* § I.C., the Commonwealth Court's 1995 opinion suggested that it had changed its position and concurred with the federal interpretation of the exemption. *See Consolidated Rail Corp. v. Pa. Pub. Util. Comm'n,* 671 A.2d 248, 250–51 (1995) (*"Conrail"*) (citing and discussing with approval *Amtrak II,* 848 F.2d at 438); *id.* at 252 ("The PUC and this Court have duly recognized the federal preemption of the subject matter of state and local assessment of charges against Amtrak for repair or replacement of railroad crossings."). It was in light of this decision, PUC now asserts, that it agreed to enter into a Consent Decree granting SEPTA substantially all of the relief sought in its Complaint. *See* SEPTA Doc. No. 22 at 3–4.

The Consent Decree between SEPTA and PUC required PUC to rescind all previous costs allocated to SEPTA in violation of the statutory exemption and to reassign those costs to nonexempt parties. Consent Decree, SEPTA Doc. No. 10, filed Jan. 22, 1996 ("Consent Decree"), at ¶ 4. The Consent Decree also expressly precluded PUC from assessing any future costs in violation of the exemption:

> Unless permitted by subsequent amendment to, or repeal of [the statutory exemption], henceforth in all PUC above-grade crossing proceedings involving

---

11. The Third Circuit has since reaffirmed its reading of "taxes" to include assessments for highway bridge costs. *Wheeling & Lake Erie Ry. Co. v. Pa. Pub. Util. Comm'n,* 141 F.3d 88, 94–95 (3d Cir.1998) (*"Wheeling"*). In that decision, the court explicitly rejected PUC's request that it overrule its two earlier decisions interpreting the statutory exemption. *Id.* at 97.

12. Because of the large number of filings now before the Court (more than twenty), and because of the confusion created by entries on two different dockets, any citations to the parties' filings will be by case name (Amtrak or SEPTA) and document number assigned to the particular document on the Clerk's docket.

SEPTA railroad operations or SEPTA railroad rights-of-way, whether such proceedings are initiated by the Commission, SEPTA or by any other party, the Commission shall not assign to SEPTA, either on a temporary or on a permanent basis, *any* Assessed Cost or Responsibility in violation of SEPTA's statutory exemption with respect to Highway Bridges as set forth in paragraph no. 1 of this Consent Decree.

*Id.* at ¶ 3 (emphasis added). The parties agree that the costs at issue in this case are of the same nature as those defined in Paragraph No. 1 of the Consent Decree.[13] One other provision of the Decree must be noted—the provision that the Court would "retain jurisdiction over this action to enforce the provisions of this Consent Decree, including any claims of SEPTA arising out of the Commission's failure to comply with SEPTA's federal statutory exemption." *Id.* at ¶ 15.

### E. PUC'S EFFORTS TO VACATE THE CONSENT DECREE

In 1996, less than three months after PUC entered into the Consent Decree with SEPTA, the Commonwealth Court issued a decision again disagreeing with the federal courts' interpretation of the statutory exemption and holding that PUC could assess highway bridge costs to Amtrak. *City of Philadelphia v. Pa. Pub.*

*Util. Comm'n,* 676 A.2d 1298, 1308–09 (1996) ("*City of Philadelphia I* ").

In 1998, the Commonwealth Court again addressed the applicability of the statutory exemption, specifically focusing on costs with respect to the Woodland Avenue bridge in Philadelphia. *See City of Philadelphia v. Pa. Pub. Util. Comm'n,* 720 A.2d 845 (1998) ("*City of Philadelphia II* "). The Woodland Avenue bridge had been the subject of the Commonwealth Court's 1991 decision in *SEPTA I,* in which case the court approved PUC's assessment of costs to SEPTA for maintenance on that bridge. In the 1998 case, however, PUC argued that this Court's Consent Decree amounted to an "intervening change in the controlling law" which prevented PUC from assessing costs to SEPTA for the Woodland Avenue bridge. *City of Philadelphia II,* 720 A.2d at 848–49. The Commonwealth Court rejected PUC's argument. Explaining that the 1991 decision was a final judgment with respect to the Woodland Avenue bridge, the court concluded that SEPTA could not collaterally attack that judgment in a federal court. *Id.* at 851 (citing *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 755 F.2d 38, 43 (3d Cir. 1985)). Accordingly, the Commonwealth Court held that PUC was required to assess to SEPTA costs for maintenance of

---

**13.** That paragraph provides, as follows:

Under 49 U.S.C. §§ 24301(*l* ) and 24501(g), the Commission is barred hereafter from assessing or continuing to assess upon SEPTA the cost or responsibility of or for design, construction, reconstruction, inspection, maintenance, removal of snow, ice, debris or graffiti, or repair ("Assessed Cost or Responsibility") of any Highway Bridge (further defined for this Consent Decree to also include all components, including without limitation, approaches, substructures and superstructures, highway decking, as well as railings, walls, fences and shielding of any kind, and stairways and ramps attached to the bridge (except where expressly accepted by SEPTA, either in writing to the Commission or on the record of a Commission proceeding, as a necessary part of an adjacent SEPTA-owned railroad station), and all lighting, drainage and highway signage). The term "Highway Bridge" shall not include any railroad catenary attachment on a Highway Bridge, and shall not include any railroad facilities beneath a Highway Bridge.

Consent Decree at ¶ 1.

the Woodland Avenue bridge consistent with the 1991 judgment. *Id.* at 852.

In light of the Commonwealth Court's decisions in *City of Philadelphia I* and *City of Philadelphia II*, PUC filed in this Court a motion to vacate the Consent Decree. PUC raised three arguments in support of this motion: (1) this Court had no subject matter jurisdiction to approve the Consent Decree because the Full Faith and Credit Act, 28 U.S.C. § 1738, required the Court to defer to the Commonwealth Court's 1991 decision; (2) the Court had no subject matter jurisdiction to approve the Consent Decree under the *Rooker–Feldman* doctrine; and (3) municipal and other governmental entities to which PUC assessed costs not assessed to SEPTA or Amtrak because of the statutory exemption were necessary parties to the action and impermissibly not joined. *SEPTA V,* 1999 WL 639946, at *3. This Court denied most of the relief requested in the PUC motion to vacate.

With respect to PUC's first argument concerning the Full Faith and Credit Act, this Court explained that PUC had never before raised a res judicata defense and had therefore waived that defense. *Id.* at *4–5 (citing Fed.R.Civ.P. 8(c)). In short, this Court held: "[SEPTA] brought this action in 1995. It is long past the time to raise an affirmative defense such as res judicata." *Id.* at *5.

Turning to PUC's *Rooker–Feldman* argument, this Court acknowledged that the Commonwealth Court's 1991 decision with respect to the Woodland Avenue bridge was a final judgment. Because that judgment was finalized before entry of the Consent Decree, "under *Rooker–Feldman,* the Court had no jurisdiction to approve the consent decree to the extent the decree affected SEPTA's maintenance responsibilities with respect to the Woodland Avenue bridge." *Id.* at *6. For that reason, this Court held that it must vacate the

Consent Decree "insofar as it conflicts with the 1991 Commonwealth Court decision," and it did so. *Id.*

Finally, the Court rejected PUC's argument that the Consent Decree should be vacated because necessary parties to the action were not joined. The Court explained:

> The third parties to which PUC refers, the various township and county governments in which the bridges at issue in this case lie, did not lose any legal rights under the consent decree. Rather, the Court, by approving the consent decree, declared that SEPTA was not responsible for the maintenance of the bridges. The adverse consequences of that order may have resulted in action by PUC which in turn affected the third parties, such as the shifting of maintenance costs to the third parties which might have been assumed by SEPTA absent the consent decree. However, the order itself had no such adverse effect.

*Id.* at *7. For these reasons, the Court concluded that "the non party governmental entities were not necessary parties and denie[d] the PUC motion on that ground." *Id.*

The net effect of this Court's 1999 decision, then, was to leave the Consent Decree intact except as it applied to the Woodland Avenue bridge. As to all other bridges incorporated in the Consent Decree, PUC was precluded from allocating to SEPTA "any Assessed Cost or Responsibility in violation of SEPTA's statutory exemption." Consent Decree at ¶ 3.

## F. LLOYD STREET BRIDGE PROCEEDINGS

In 1997, before this Court's decision rejecting PUC's efforts to vacate the entire Consent Decree, PUC initiated proceedings to assess costs for maintenance and construction on the Lloyd Street Bridge in

Chester, Pennsylvania. On September 1, 2000, PUC entered an order allocating these costs to governmental entities and private entities, including Consolidated Rail Corporation ("Conrail"). In light of the Third Circuit's 1988 *Amtrak II* decision and this Court's Consent Decree, PUC did not allocate any costs to either Amtrak or SEPTA.

The parties to which PUC allocated costs appealed the 2000 PUC cost allocation order to the Commonwealth Court. That court, citing its 1996 decision in *City of Philadelphia I, see supra* § I.E., vacated PUC's order. The court reasoned that "[b]ecause the PUC is a state administrative agency over which state courts have jurisdiction to determine what law it is to apply, including the interpretation of a federal law unless reversed by the United States Supreme Court, it was required to apply the holding in *City of Philadelphia* to this case." *City of Chester v. Pa. Pub. Util. Comm'n,* 773 A.2d 1280, 1286 (Pa. Commw.Ct.2001) (*"City of Chester I"*). The court remanded the case to PUC "to conduct an additional hearing for the purpose of determining the allocation of costs associated with the Bridge that include Amtrak and SEPTA as well as all of the other parties involved." *Id.*

On remand, PUC issued an opinion and order dated September 7, 2001, revising its September 1, 2000, order. The revised order allocated to the City of Chester seventy-five percent of costs for maintenance and construction of the Lloyd Street bridge. The remaining costs were allocated to five separate parties, with each party assessed an equal share of five percent. The additional parties assessed five-percent of the costs included Amtrak and

SEPTA, as well as Norfolk Southern, the successor in interest to Conrail.[14] *See* PUC Sept. 7, 2001, Opinion and Order, SEPTA Doc. No. 20, Ex. E ("PUC Opinion and Order") at 22. Since PUC issued its Opinion and Order, the parties to the actions now before the Court have submitted a number of filings in different fora.

Because the Commonwealth Court had retained jurisdiction over the Lloyd Street bridge proceedings, *see City of Chester I,* 773 A.2d at 1288, that court required all parties to file exceptions to PUC's order on remand by November 7, 2001. In the interim, PUC sought review before the Supreme Court of Pennsylvania, which review was denied. *City of Chester v. Pa. Pub. Util. Comm'n,* 567 Pa. 747, 788 A.2d 379 (2001). PUC then filed a petition for writ of certiorari in the United States Supreme Court, which petition was also denied. *Pa. Pub. Util. Comm'n v. City of Chester,* —— U.S. ——, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002). Norfolk Southern filed an appeal of the PUC Opinion and Order in the Commonwealth Court. As discussed below, *see infra* § I.G., on May 1, 2002, the Commonwealth Court decided that appeal in Norfolk Southern's favor.

Amtrak did not seek any relief in the Pennsylvania courts, but instead filed a motion before Judge Newcomer seeking to expand the Cassatt Avenue bridge injunction to cover *all* bridges crossing an Amtrak right of way. SEPTA, which also declined to seek relief in the Pennsylvania courts, moved to intervene in that action. On October 16, 2001, Judge Newcomer denied both motions, concluding that although federal courts have determined that PUC may not assess costs to Amtrak

---

**14.** The parties dispute in their initial filings whether the Commonwealth Court's remand order required PUC to assess costs to Amtrak and SEPTA, or rather, whether PUC was merely required to *consider* assessing costs to

Amtrak and SEPTA. The Commonwealth Court's May 1, 2002, opinion, however, which, as discussed below, *see infra* § I.G., affirmed PUC's assessments to SEPTA and Amtrak, moots this dispute.

for highway bridges, Amtrak had not demonstrated that PUC had violated the injunction with respect to the Cassatt Avenue bridge. *See* Complaint, Amtrak Doc. No. 1, Ex. F at 4.

## G. CURRENT PROCEEDINGS BEFORE THIS COURT

On October 23, 2001, SEPTA filed its Motion to Enforce the Consent Decree. Thereafter, on November 2, 2001, Amtrak initiated a new action against PUC and its individual commissioners, and that action was assigned to this Court. Amtrak's Complaint seeks relief in three counts: (1) a declaratory judgment that PUC has violated the statutory exemption; (2) a preliminary and permanent injunction barring PUC from imposing costs on Amtrak with respect to any highway bridge in Pennsylvania; and (3) enforcement of prior judgments with respect to the applicability of the statutory exemption on collateral estoppel grounds. PUC and the individual commissioners then filed two separate Motions to Dismiss Amtrak's Complaint. Additionally, on January 2, 2002, Amtrak filed a Motion for Preliminary and Other Injunctive Relief. Amtrak's Complaint and request for injunctive relief seek substantially the same relief as the Court granted SEPTA in approving the Consent Decree in 1996.[15]

Norfolk Southern, which was also assessed costs by PUC in the Lloyd Street Bridge proceedings, moved under Fed. R.Civ.P. 24 to intervene as a defendant in both the SEPTA and Amtrak cases. Norfolk Southern argues in both motions that it has a significant interest in the outcome of this litigation because its responsibility for bridge maintenance costs is directly affected by whether costs are assessed to Amtrak and SEPTA. Both Amtrak and SEPTA oppose Norfolk Southern's motions to intervene. PUC does not oppose these motions.

Upon receiving and reviewing the first of these filings, the Court convened a telephone status conference on December 20, 2001. After discussion with the parties about the issues presented by the pending motions, the Court ordered, on December 20, 2001, submission of supplemental briefing on the "issues presented by the conflict, or potential conflict, between the state court which has ruled on the issues, the Commonwealth Court, and the Federal Consent Decree and/or other Federal Orders issued or sought by the parties." The Court also scheduled an oral argument on all pending motions. The parties submitted all filings in accordance with the December 20, 2001, Order. The Court held oral argument on January 11, 2002.

After oral argument, the Commonwealth Court, on May 1, 2002, decided Norfolk Southern's appeal of PUC's September 7, 2001, Opinion and Order assessing costs with respect to the Lloyd Street bridge. *See City of Chester v. Pa. Pub. Util. Comm'n,* 798 A.2d 288 (2002) ("*City of Chester II*"). In that decision, the Commonwealth Court agreed with Norfolk Southern's objection to the Opinion and Order "that the Commission does not have jurisdiction to allocate maintenance costs to [Norfolk Southern] because only the owner of property and facilities at a rail crossing is liable for maintenance obligations." *Id.* at 292. Following this conclusion, the court held that "because an owner of a railroad with a crossing over its line is the party responsible for costs associated with that rail line, and there is no dispute that Amtrak, not Norfolk Southern, is the owner of the rail-line and cross-

---

**15.** Amtrak's submissions to the Court contain some inconsistencies in the scope of relief it requests. The Court discusses the scope of relief more thoroughly in addressing Amtrak's Motions for Declaratory and Injunctive Relief. *See infra* § V.

ing at issue," PUC's assessment of costs to Norfolk Southern was an abuse of discretion. *Id.* at 294. In light of that abuse of discretion, the court ordered that the five-percent assessment of costs allocated to Norfolk Southern be shifted to Amtrak, thus resulting in a judgment assessing to Amtrak ten percent of the costs for maintenance on the Lloyd Street bridge. *Id.* at 294–95.

In response to the Commonwealth Court's decision, Amtrak filed its Renewed Motion for Declaratory Judgment and for Preliminary and Permanent Injunction. Amtrak's Renewed Motion broadens the scope of requested relief by seeking, in addition to the injunctive relief initially sought, a declaratory judgment that the Commonwealth Court's *City of Chester II* decision is "null and void" insofar as it applies to Amtrak.

The Court will next proceed to consider each motion, or set of related motions, in turn.

## II. *NORFOLK SOUTHERN'S MOTIONS TO INTERVENE*

Norfolk Southern seeks to intervene as a defendant in both the SEPTA case and the Amtrak case. Norfolk Southern is not a covered entity under the statutory exemption and requests intervention on the ground that highway bridge costs not assessed to Amtrak or SEPTA pursuant to the federal court interpretation of the exemption might be assessed to it.[16] Should

the Court permit intervention in the SEPTA case, Norfolk Southern asserts that it will move to vacate the consent decree. In the Amtrak case, Norfolk Southern states it will seek to relitigate the Third Circuit's determination in *Amtrak II* as to the scope of the exemption. In both cases, Norfolk Southern says it will ask the Court to address the proper assessment of costs.[17]

In the motions to intervene, Norfolk Southern argues that it is entitled to intervene as of right under Fed.R.Civ.P. 24(a)(2), or, alternatively, that it should be permitted to intervene under Fed.R.Civ.P. 24(b)(2). Because the motions in both cases are substantially the same, and because SEPTA's and Amtrak's responses to both of the motions are, likewise, substantially the same, the Court will address the motions together. For the reasons set forth below, the Court concludes that Norfolk Southern has failed to meet the threshold requirements for both forms of intervention under Fed.R.Civ.P. 24.

### A. INTERVENTION AS OF RIGHT

■ An applicant for intervention may intervene as of right when: (1) "the applicant claims an interest relating to the property or transaction which is the subject of the action"; (2) "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (3) the applicant's interest

---

16. The Court notes that Judge Newcomer has twice denied requests by the Pennsylvania Department of Transportation (PennDOT) for intervention in the Cassatt Avenue bridge case. In both cases, PennDOT raised similar arguments to those now made by Norfolk Southern. *See Amtrak IV*, 1997 WL 587278, at *2–4; *Amtrak III*, 1991 WL 993, at *1–3.

17. This specific request for relief is mooted by the Commonwealth Court's *City of Chester II* decision affirming Norfolk Southern's objections to PUC's September 7, 2001, Opinion

and Order. Because the *City of Chester II* court ordered that costs previously assessed to Norfolk Southern be assessed to Amtrak, Norfolk Southern has no injury to remedy with respect to the Lloyd Street bridge cost assessments. The Court notes, however, that the remainder of Norfolk Southern's Motions to Intervene are not mooted by *City of Chester II* because of Norfolk Southern's arguments in both cases that the Court's resolution of the statutory exemption issues will impact Norfolk Southern in the future.

is not "adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The application for intervention must also be timely. *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir.1987).

■ To meet the first of the above requirements, Norfolk Southern's "interest must be one that is 'significantly protectable.' " *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir.1995) (quoting *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971)). In explaining what makes an interest "significantly protectable," the Third Circuit has "held that, 'the interest must be a legal interest as distinguished from interests of a general and indefinite character.' " *Id.* (quoting *Harris*, 820 F.2d at 601) (internal citations omitted). Importantly, "a mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene." *Id.* (citing *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1185 (3d Cir.1994); *New Orleans Public Serv., Inc. v, United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir.1984) ("*NOPSI* ")); *see also Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 1999 WL 1017403, at *1 (E.D.Pa. Nov. 3, 1999).

■ Upon a review of the parties' filings and upon hearing counsel for Norfolk Southern's arguments at oral argument, the Court concludes that Norfolk Southern's claimed interest in these proceedings can only be described as a "mere economic" one. In short, Norfolk Southern is seeking to intervene solely on the ground that the Court's enforcement of the SEPTA Consent Decree, and, likewise, the Court's issuance of injunctive relief in the

Amtrak case, would compel Norfolk Southern to pay larger assessments.[18] This claimed interest is not sufficient to justify intervention as of right under Fed.R.Civ.P. 24(a)(2).

Examination of two cases with similar claimed interests lends further support to the Court's conclusion. The first case is the Fifth Circuit's decision in *NOPSI*, which involved a contract between an investor-owned utility and a supplier of natural gas. *NOPSI*, 732 F.2d at 455. The utility sued the supplier for declaratory relief concerning interpretation of certain terms of the contract. *Id.* at 459–60. Customers of the utility subsequently moved to intervene asserting that they had an interest in the case because the litigation might result in higher rates. *Id.* at 460–62. Finding that the "the *only* 'interest' asserted as a basis for intervention [was] a purely economic interest," the court held this interest insufficient for intervention under Fed.R.Civ.P. 24(a)(2). *Id.* at 466.

A second analogous, and more recent, case is the Eighth Circuit's decision in *Curry v. Regents of Univ. of Minn.*, 167 F.3d 420 (8th Cir.1999). In that case, five students brought suit against the defendants alleging that the University of Minnesota's Student Services Fee violated their constitutional rights to the extent their fees were distributed to campus student groups whose purposes the plaintiff students found objectionable. *Id.* at 421. The plaintiffs' complaint specifically named three student groups. *Id.* The three named student groups then moved to intervene, arguing that the lawsuit threatened their right to disbursement of the

---

**18.** The Court notes that it concluded in its 1999 decision that the Consent Decree had no adverse effect on third parties not bound by the Consent Decree by causing increased assessments to those third parties. *See SEPTA V*, 1999 WL 639946, at *6–7. Although the

Court could reject Norfolk Southern's arguments on the ground that the earlier decision is the law of the case with respect to the SEPTA case, the Court must conduct a more detailed analysis because the law-of-the-case doctrine does not apply to the Amtrak case.

Student Services Fee. *Id.* The court rejected the motions to intervene, finding that the applicants had not established a sufficient interest in the subject matter of the lawsuit. *Id.* at 422. The mere assertion of an economic interest, "maintaining the quantum of their funding," did not, the court concluded, "rise to the level of a legally protectable interest necessary for mandatory intervention." *Id.* at 422–23 (citing *Standard Heating and Air Conditioning Co. v. City of Minneapolis,* 137 F.3d 567, 571 (8th Cir.1998); *Greene v. United States,* 996 F.2d 973, 976 (9th Cir. 1993)).

Norfolk Southern's claimed interest is directly analogous to the interests claimed in *NOPSI* and *Curry.* Just like utility customers concerned about the implications of their utility's supply contract, and just like student groups' concerns about the continued distribution of a student services fee, Norfolk Southern's interest is limited to the economic effects generated by the outcome of this litigation.

The impropriety of allowing Norfolk Southern to intervene as of right in these cases is further demonstrated by counsel for Norfolk Southern's own admission at oral argument. Asked whether, in line with the economic interest claimed by Norfolk Southern to establish a protectable interest under Fed.R.Civ.P. 24(a)(2), the Court should allow *any* party which might be ordered to pay highway bridge assessments in lieu of SEPTA or Amtrak to intervene as of right, Norfolk Southern's counsel answered in the affirmative. *See* Jan. 11, 2002, Hr'g Tr. at 87–88. Counsel agreed that, given the nature of these cases, this view would require intervention by every state and local governmental entity or private party that might benefit from a highway bridge—resulting in an untold (but certainly large) number of parties.

This result—intervention by a large number of parties with economic interests only—is certainly not one countenanced by the precedents discussed above. Thus, like the Fifth and Eighth Circuits, and in accordance with the principles set forth by the Third Circuit in *Mountain Top,* the Court concludes that Norfolk Southern may not intervene as of right in these cases.

### B. PERMISSIVE INTERVENTION

■ Any party may be permitted to intervene in an action when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). Intervention under this rule is a matter left to this Court's discretion. *See, e.g., Hoots v. Pennsylvania,* 672 F.2d 1133, 1135–36 (3d Cir.1982).

■ Norfolk Southern asserts that it wants to litigate a question of law common to both the SEPTA and Amtrak cases— the applicability and scope of the statutory exemption. More specifically, Norfolk Southern seeks to intervene in this case to vacate the SEPTA–PUC consent decree and relitigate the issue adjudicated by the Third Circuit in the Amtrak–PUC litigation. In short, Norfolk Southern seeks to have the Court consider the merits. That issue, however, is not at all the focus of these proceedings. Rather, these proceedings involve *procedural* issues—the enforceability of prior federal court judgments in the face of conflicting state court judgments.

In light of the focus of these proceedings, the Court concludes that the issues Norfolk Southern seeks to litigate are not at all "common" to the "main action." Fed.R.Civ.P. 24(b)(2). Moreover, to the extent that Norfolk Southern seeks to add to PUC's response to the res judicata and collateral estoppel arguments asserted by SEPTA and Amtrak, the Court concludes

that Norfolk Southern's defenses are duplicative of those raised by PUC. Thus, Norfolk Southern's intended responses are an insufficient basis for permissive intervention. *See Brock v. McGee Bros. Co.,* 111 F.R.D. 484, 487 (W.D.N.C.1986) ("It is doubtful . . . whether [Fed.R.Civ.P. 24(b)(2) ] was intended to provide for intervention by an applicant who apparently desires merely to assist in asserting the same defense already asserted by the Defendant.").

There is no basis for permitting Norfolk Southern to intervene in this case. Therefore, the Court will not allow permissive intervention.

### III. *SEPTA'S MOTION TO ENFORCE THE CONSENT DECREE*

SEPTA argues as follows in support of its motion: The Consent Decree approved by this Court prohibited PUC from allocating "any Assessed Cost or Responsibility in violation of SEPTA's statutory exemption." Consent Decree at ¶ 3. PUC has assigned costs to SEPTA for maintenance and construction of the Lloyd Street bridge. SEPTA is exempted from such costs under the statutory exemption and PUC's assessment thus violates the Consent Decree. Because the Court retained jurisdiction to enforce the Consent Decree, *see* Consent Decree at ¶ 15, the Court should enjoin PUC from assessing to SEPTA costs with respect to the Lloyd Street bridge.

PUC makes a number of arguments in response to SEPTA's motion, which, in summary, assert that: (1) this Court should not exercise jurisdiction in this matter under either the *Younger* abstention doctrine, *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or the *Rooker–Feldman* doctrine, *see District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,*

263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); and (2) the Court should not enforce the Consent Decree because such a disposition would subject PUC to conflicting orders from a state court and a federal court. The Court will address each of PUC's arguments in turn.

### A. JURISDICTIONAL ISSUES: *YOUNGER* AND *ROOKER– FELDMAN*

PUC's arguments that the Court should not exercise jurisdiction over this matter can be disposed of summarily.

■ The *Younger* doctrine generally dictates federal court abstention in cases involving ongoing state-court proceedings. That doctrine is inapplicable, however, in cases where "proceedings of substance on the merits have taken place in the federal court." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 238, ·104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (internal quotations and citations omitted); *see also Ford Motor Co. v. Ins. Comm'r of Commonwealth of Pa.,* 874 F.2d 926, 932 n. 8 (3d Cir.1989). SEPTA's case against PUC has been before this Court since 1995. The proceedings resulted in a Consent Decree, "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *see also United States v. Athlone Indus.,* 746 F.2d 977, 983 n. 5 (3d Cir.1984) (citing *Interdynamics, Inc. v. Firma Wolf,* 653 F.2d 93, 96–97 (3d Cir.1981)) ("A consent decree is generally treated as a final judgment on the merits and accorded res judicata effect."). *But see Imprisoned Citizens Union v. Shapp,* 11 F.Supp.2d 586, 596–98 (E.D.Pa.1998), *aff'd,* 169 F.3d 178 (3d Cir.1999) (holding that consent decree

is not a "final judgment" for separation-of-powers purposes such that Congress could permissibly change law governing prospective relief provided in consent decree).

The state proceedings with respect to the Lloyd Street bridge began, at the absolute earliest, in 1997, when PUC commenced its investigation into maintenance of that bridge. The Consent Decree, which is a final judgment on the merits, and can therefore only be the result of "proceedings of substance on the merits" in a federal court, was approved in 1996. *Younger* abstention is therefore inapplicable in this case.

 A similar analysis as to timing—that is, that the federal Consent Decree was finalized before initiation of the state proceedings—applies in the *Rooker–Feldman* context. That doctrine prevents a federal court from exercising jurisdiction "when in order to grant the federal plaintiff the relief sought, the federal court must determine that [a] state court judgment was erroneously entered or must take action that would render that judgment ineffectual." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir.1996). The doctrine is inapplicable, however, when, as in this case, the federal litigation begins before the state court litigation. *Central Reserve Life Ins. Co. v. Marello*, 2001 WL 41129, at *4 (E.D.Pa. Jan. 17, 2001) (citing *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 138 (2d Cir.1997)). The Court therefore finds that the *Rooker–Feldman* doctrine does not bar its exercise of jurisdiction over SEPTA's motion.

### B. CONFLICTING FEDERAL AND STATE COURT JUDGMENTS

The Court acknowledges that enforcement of the Consent Decree will, as PUC laments, subject PUC to two inconsistent judgments. On the one hand, this Court's Order prohibits PUC from assessing to SEPTA highway bridge maintenance costs, while, on the other hand, the Commonwealth Court's order requires PUC to do exactly that.

The Court notes that PUC has not exhibited any ill motive or other contemptuous behavior in violating this Court's Consent Decree. When PUC entered into the Consent Decree, it believed, based on the Commonwealth Court's 1995 decision in *Conrail*, that the Commonwealth Court and federal courts were in agreement in interpreting the scope of the statutory exemption. *See Conrail*, 671 A.2d at 250–52.

Nevertheless, the potential for conflict and lack of ill motive are not valid reasons for this Court to stay its hand in enforcing the Consent Decree. On the contrary, the potential for conflict gives the Court all the more reason to enforce the Consent Decree under the authority of *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 F.2d 38 (3d Cir.1985) ("*Delaware Valley*"), a case quite analogous to the present one. In this section, the Court will first discuss how principles of res judicata, as explained in *Delaware Valley*, compel the Court's enforcement of the Decree. The Court will then address several of PUC's counter arguments to such enforcement.

#### 1. Res Judicata and Enforcement of the Consent Decree

In the Third Circuit's *Delaware Valley* decision, the plaintiffs sought an injunction compelling the Commonwealth of Pennsylvania to implement a vehicle emission and maintenance program as required by federal regulations. *Delaware Valley*, 755 F.2d at 40. The parties entered into a Consent Decree under which the Commonwealth defendants were obligated to seek legislation establishing and implementing such a program. *Id.* Unhappy with the mandates of the Consent Decree, several

Pennsylvania state legislators filed state court actions for declaratory judgments decreeing that the Commonwealth parties who had entered into the Consent Decree lacked the legal authority to do so. *Id.* These lawsuits resulted in the Supreme Court of Pennsylvania's ruling that the Commonwealth officials had no authority to enter into the Consent Decree; on remand, the Commonwealth Court enjoined state officials from complying with the Decree. *Id.* at 41 (citing *Scanlon v. Commonwealth,* 502 Pa. 577, 467 A.2d 1108, 1115 (1983)). The Commonwealth then returned to the district court overseeing the Consent Decree seeking to vacate the Decree. *Id.* The district court denied the Commonwealth's request. *Id.*

■■■ On the Commonwealth's appeal, the Third Circuit explained that the merits of the state court's decision were irrelevant because "resolution of this particular dispute turns on the efficacy of final judgments rendered by the federal court system." [19] *Id.* The state court's declaration that the Consent Decree was a nullity, the Third Circuit stated, "flies in the face of settled law and the doctrine of *res judicata.*" [20] *Id.* at 42. Specifically, the Supreme Court of Pennsylvania's decision violated the provisions of 28 U.S.C. § 1738, the full faith and credit statute. Although

the language of that statute, which implements the Constitution's full faith and credit clause of Article IV, § 1, refers only to state court judgments, "there 'is a clearly established rule that state courts must give full faith and credit to the proceedings of federal courts.' " *Id.* at 43 (quoting Degnan, *Federalized Res Judicata,* 85 Yale L.J. 741, 744 (1976)). The governing rule, then, as stated by the United States Supreme Court, provides: " '[W]here the judgment or decree of the federal court determines a right under a federal statute, that decision is final until reversed in an appellate court, or modified or set aside *in the court of its rendition.*' " *Id.* at 44 (quoting *Stoll v. Gottlieb,* 305 U.S. 165, 170, 59 S.Ct. 134, 83 L.Ed. 104 (1938)) (emphasis supplied) (further internal quotations and citations omitted).

In light of this principle, the Commonwealth was "bound by the federal judgment under *res judicata,*" and the merits of the Supreme Court of Pennsylvania's decision were "irrelevant to the overarching question of the competency of a state court to interfere with a final, federal court judgment bottomed on federal law." *Id.* Accordingly, the Third Circuit affirmed the district court's denial of the Commonwealth's motion to vacate the Consent Decree. *Id.* at 45.

**19.** The Third Circuit's framing of the issue and explanation of the Commonwealth's position demonstrates the similarity between *Delaware Valley* and the present case. PUC has been "[i]nformed by its own court system that the federal consent decree was a 'nullity,' " and it has "asked to be relieved from the discomfort of being ordered by the federal court system to obey an injunction and ordered by its own state court system to ignore it." *Delaware Valley,* 755 F.2d at 41.

**20.** The doctrine of res judicata, or claim preclusion, "generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues

as the earlier suit." *In re Continental Airlines, Inc.,* 279 F.3d 226, 232 (3d Cir.2002) (citations omitted). Claim preclusion thus "bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action." *CoreStates Bank, N.A. v. Huls America, Inc.,* 176 F.3d 187, 191 (3d Cir.1999). To preclude litigation of a claim, a party must establish that there was a final judgment on the merits in an earlier suit involving the same parties or their privies, and that the subsequent suit is based on the same cause of action. *Id.* at 194 (quoting *Bd. of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 504 (3d Cir.1992)).

■ The rule of *Delaware Valley* is clearly applicable to this case. The Consent Decree entered into by SEPTA and PUC is a federal court decree determining the parties' rights under a federal statute. That Decree is therefore final until reversed by the Third Circuit or until this Court modifies or sets aside the Decree. The Commonwealth Court was bound by the Decree and should have enforced it in the Lloyd Street bridge proceedings. The reasons advanced by the Commonwealth Court in *City of Chester I* for allowing PUC to assess fees to Amtrak and SEPTA are irrelevant to this Court's determination.

Notwithstanding these clear legal rules, the Commonwealth Court has stated that it is not bound by this Court's Consent Decree. *See City of Philadelphia I*, 676 A.2d at 1307 n. 16 ("Of course, we are not bound by the consent decree."); *see also City of Chester I*, 773 A.2d at 1285 (reaffirming finding in *City of Philadelphia I* that Commonwealth Court was not bound by the Decree). These statements are legally incorrect. The Commonwealth Court's conclusion was based on its concern that the Consent Decree "deprived the parties that were not a party to that decree of their due process rights to a full and fair hearing." *City of Chester I*, 773 A.2d at 1285.[21] Regardless of this concern, the Commonwealth Court was not relieved of its duty to give full faith and credit to this Court's final judgment embodied in the Consent Decree.[22]

The Commonwealth Court's failure to do so disregards numerous Pennsylvania decisions acknowledging the principles set forth by the Third Circuit in *Delaware Valley*. In that case, the Third Circuit stated that "Pennsylvania courts have long recognized the principle that state courts are bound by the judgments of federal courts." *Delaware Valley*, 755 F.2d at 44 (citing *London v. City of Philadelphia*, 412 Pa. 496, 194 A.2d 901, 902–03 (1963); *Bardo v. Commonwealth*, 40 Pa.Cmwlth. 585, 397 A.2d 1305, 1307 n. 1 (1979)).

Significantly, the Commonwealth Court has also recognized these principles—in some cases. As discussed earlier, the Commonwealth Court had approved the allocation to SEPTA of costs for the Woodland Avenue bridge in its 1991 *SEPTA I* decision. *See supra* § I.C. After PUC entered into the Consent Decree before this Court, it reallocated SEPTA's costs to the City of Philadelphia. *City of Philadelphia II*, 720 A.2d at 848. The City then sought review of PUC's allocation. Before the Commonwealth Court, PUC argued that the City could not challenge the impact of the Consent Decree. *Id.* at 849. The Commonwealth Court correctly identified the flaws in PUC's argument, explaining that the City was not challenging the Consent Decree, but seeking to "have [the court's] prior order imposing maintenance obligations on SEPTA given preclusive effect as required by the Full Faith and Credit Act." *Id.* at 850. By way of further explanation, the court pointed to *Delaware*

---

**21.** The Commonwealth Court stated its reasoning more fully in *City of Philadelphia I*:
> The PUC entry into a consent decree is problematic. The municipalities or private entities could make valid arguments that neither the federal courts or [*sic*] this court has considered. By entering into the consent decree agreeing not to allocate any costs to SEPTA, the PUC has prejudged those arguments and deprives those parties

of their due process right to a full and fair hearing.

*City of Philadelphia I*, 676 A.2d at 1307 n. 16.

**22.** This Court has already rejected a similar due-process-type argument in its consideration of PUC's assertion that certain parties were impermissibly not joined in SEPTA's action. *See supra* § I.E.

*Valley,* calling it "[p]articularly apropos to the facts of this case," *id.,* as follows:

> While *Delaware Valley* involved a later state decision that affected an earlier consent decree rather than, as here, a latter federal consent decree that affects an earlier state court judgment, we make the same observation: Unsuccessful before the PUC and this Court and rebuffed by our Supreme Court, SEPTA attempted a collateral attack on the several final judgments of the Public Utility Commission and the courts of this Commonwealth that was acceded to by the PUC.

*Id.* at 851. The court therefore rejected PUC's argument and ordered it to reinstate its allocation orders as to the Woodland Avenue bridge approved in 1991. *Id.* at 852.

It was in light of the Commonwealth Court's correct analysis in *City of Philadelphia II* that this Court issued its 1999 decision vacating the Consent Decree to the extent that it prevented PUC from allocating costs to SEPTA with respect to the Woodland Avenue bridge. *See SEPTA V,* 1999 WL 639946, at *6. The Commonwealth Court's order allowing assessments to SEPTA with respect to that bridge was a final judgment that this Court could not reverse. *See supra* § I.E. (discussing vacatur of Consent Decree as to Woodland Avenue bridge on *Rooker–Feldman* grounds). After that 1999 decision, the remainder of the Decree, which applied to all other highway bridges, remained intact. Accordingly, absent any meritorious arguments as to why the Decree did not remain enforceable, the Commonwealth Court should have given effect to the Decree.

### 2. Analysis of PUC's Counter Arguments

PUC raises a number of arguments urging the Court to refuse enforcement of the Decree. The Court addresses three of those arguments regarding (1) deference to the Commonwealth Court's rulings; (2) SEPTA's opportunity to defend its exemption in state court; and (3) the purported impracticalities of conflicting federal and state court judgments.

The Court rejects each of these arguments because (1) PUC has waived a res judicata defense; (2) SEPTA has permissibly—and strategically—not appeared in state court to defend its exemption so as to prevent an adverse res judicata ruling under *Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); and (3) the Court will be able to enforce its judgment under the All Writs Act. The Court now briefly discusses the reasoning supporting these conclusions.

### a. Waiver of res judicata defense

 PUC argues that this Court should defer to the Commonwealth Court's decisions holding the statutory exemption inapplicable to PUC cost assessments. This is the same argument PUC made in 1999 when asking the Court to vacate the Consent Decree. Before that 1999 motion to vacate the Consent Decree, however, PUC had not raised a res judicata defense. Accordingly, this Court held that PUC had waived that defense. *See SEPTA V,* 1999 WL 639946, at *4–5 (citing, *inter alia,* Fed.R.Civ.P. 8(c)).[23] That ruling is the law of this case. *See In re Continental Airlines, Inc.,* 279 F.3d 226, 232–33 (3d Cir. 2002) (stating that law of the case doctrine "is concerned with the extent to which the

---

**23.** The Court notes that PUC also failed to raise the res judicata defense before Judge Pollak. Judge Pollak's opinions in *SEPTA III* and *SEPTA IV* do not analyze that defense.

law applied in decisions at various stages of the same litigation becomes the governing legal precept in later stages" and that doctrine "limits relitigation of an issue once it has been decided"). If PUC wanted to argue the res judicata defense—that this Court should defer to the Commonwealth Court's decisions—it should have raised that defense before it decided to enter into the Consent Decree; PUC may not reargue its previously rejected res judicata defense to escape the effect of that Decree. *Cf. Delaware Valley*, 755 F.2d at 44 (noting that Commonwealth defendants should have litigated merits of their claim before entering into the Consent Decree).

### b. SEPTA's permissible avoidance of state court litigation

 PUC argues that SEPTA should be held responsible for failing to defend its exemption in state court proceedings by appearing as a party. As an initial matter, SEPTA is under no legal duty to appear in state court to preserve a federal judgment in its favor. More importantly, SEPTA has chosen not to appear in state court actions for good reasons. At oral argument, SEPTA asserted that should it enter litigation before the Commonwealth Court in defense of its exemption, that court could explicitly refuse to give full faith and credit to the federal courts' judgments. This Court, argues SEPTA, would then be bound to give the Commonwealth Court's judgment res judicata effect against SEPTA—that is the Commonwealth Court's judgment as to res judicata would be entitled to res judicata effect in this Court.

Such is the situation that arose in *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). In that case, the plaintiff sued the defendant bank in two separate actions, one in state court and one in federal court. *Id.* at 520, 106 S.Ct. 768. The federal court entered judgment in favor of the defendant, and the defendant subsequently

pleaded defenses of res judicata and collateral estoppel in the state court. *Id.* The state court, however, rejected these defenses, and the state court litigation resulted in a jury verdict of four million dollars against the defendant. *Id.* The defendant sought an injunction from the federal court to prevent execution of the state court judgment and to enforce the federal court judgment in its favor; that relief was granted. *Id.* at 520–21, 106 S.Ct. 768. The Supreme Court then held that the district court could not grant the injunction without first considering the preclusive effect of the state-court's judgment rejecting the defendant's res judicata and collateral estoppel defenses. *Id.* at 525, 106 S.Ct. 768.

As one commentator has explained, the effect of *Parsons Steel* is to require that "once the res judicata issue was raised in state court and decided, then the federal court must accept the state's determination that there is not preclusion." Erwin Chemerinsky, *Federal Jurisdiction* § 11.2.4 (2d ed.1994). After the state court proceedings were completed in *Parsons Steel* "and especially once the res judicata issue was ruled on by the state court, then the federal court was bound by the state court's determination." *Id. See also Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 573 n. 8 (3d Cir.2002) (citing *Parsons Steel*, 474 U.S. at 525, 106 S.Ct. 768) ("Even ... where the state court—arguably wrongly—did not find any preclusive effect, the Supreme Court unanimously refused to allow the prior federal winner to seek a federal court injunction against further proceedings.").

Under the *Parsons Steel* rule, should SEPTA appear as a party before the Commonwealth Court and raise this Court's Consent Decree as a res judicata defense to an assessment of highway bridge costs, the Commonwealth Court could reject that

defense. Even though, in light of the principles the Third Circuit set forth in *Delaware Valley*, the Commonwealth Court would clearly be incorrect in doing so, under *Parsons Steel*, this Court would be compelled to give preclusive effect to the Commonwealth Court's decision.

This situation has not arisen in the present case. Aside from the 1991 decision in *SEPTA I* with respect to the Woodland Avenue bridge, none of the Commonwealth Court's rulings have been held by that court to have res judicata effect against SEPTA. Accordingly, SEPTA has good reason to return to this Court to preserve the effect of the Consent Decree. By not becoming a party in a state court action, SEPTA has avoided an adverse res judicata ruling. PUC's argument that SEPTA should litigate this matter in state court thus has no merit.

### c. Preservation of judgments under the All Writs Act

■ PUC devotes much of its argument to asserting that this Court's enforcement of the Consent Decree will result in an unmanageable scenario of conflicting judgments. In making this argument, PUC did not consider the fact that this Court retains jurisdiction to enforce its Order. This is the result of the statutory authority available to the Court to enforce its Consent Decree: a combination of the Anti–Injunction Act, 28 U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651.

Generally, under the Anti–Injunction Act, a federal court may not enjoin state proceedings. A federal court may, however, stay state court proceedings "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The quoted provision "is also known as the 'relitigation exception' to the Anti Injunction Act." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*,

261 F.3d 355, 364 (3d Cir.2001) (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988)). The exception " 'was designed to permit a federal court to prevent state litigation of an issue that previously was presented to, and decided by, the federal court.' " *Id.* (quoting *Chick Kam Choo*, 486 U.S. at 147, 108 S.Ct. 1684); *see also,* Erwin Chemerinsky, *Federal Jurisdiction* § 11.2.4 (2d ed.1994) (explaining that the relitigation exception "prevents the harassment of federal court litigants by repetitive state court proceedings" and that it "applies only in situations where because of res judicata the state court should not hear a case, but does so anyway"). The exception applies in this case. As stated by the Third Circuit in the analogous *Delaware Valley* decision, "in the event of a further attempt" at state-court interference with the federal consent decree, "the Commonwealth parties may avail themselves of remedies 'to protect and effectuate [United States court] judgments' permitted under 28 U.S.C. § 2283." *Delaware Valley*, 755 F.2d at 45 n. 6. That is exactly the relief SEPTA seeks in this case.

The procedural mechanism for this Court's action under the relitigation exception is the All Writs Act, 28 U.S.C. § 1651. That statute provides in pertinent part: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All–Writs Act 'acts in concert' with the Anti–Injunction Act 'to permit the issuance of an injunction.' " *In re Prudential*, 261 F.3d at 365 (quoting *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 201 n. 9 (3d Cir.1993)); *see also In re Diet Drugs*, 282 F.3d 220, 233–35 (3d Cir.2002) (discussing application of relitigation exception to Anti–Injunction Act and All Writs Act).

The Court's use of the All Writs Act directly addresses PUC's concerns that it will be subject to conflicting federal- and state-court orders, because, as a majority of courts have held, the All Writs Act authorizes a federal court to exercise removal jurisdiction over state court relitigation of a finalized federal judgment. Importantly, courts addressing the issue have held removal jurisdiction exists over such state-law actions notwithstanding a lack of any other basis of federal jurisdiction.

At the outset, the Court notes that the Third Circuit has only implicitly joined the majority trend. In the one case to address the question, the Third Circuit did not approve removal under the All Writs Act, but did state that "[a] district court, in exceptional circumstances, may use its authority under the Act to remove an otherwise unremovable state court action to 'prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *Davis v. Glanton,* 107 F.3d 1044, 1047 n. 4 (3d Cir.1997) (quoting *United States v. N.Y. Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). Although this language was not essential to the holding, other courts have cited *Davis* for the proposition that the Third Circuit is of the view that the All Writs Act confers removal jurisdiction. *Henson v. Ciba–Geigy Corp.,* 261 F.3d 1065, 1069–70 (11th Cir.2001); *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 411 n. 4 (7th Cir.2000); *NAACP v. Metro. Council,* 144 F.3d 1168, 1171 (8th Cir. 1998); *First Union Nat'l Bank v. Frempong,* No. 99–1434, 1999 WL 376021, at *1 n. 2 (E.D.Pa. June 9, 1999); *Raggio v. Omega Inst., Inc.,* No. 98–CV–2782, 1998 WL 377904, at *4 (D.N.J. July 2, 1998); *see also Holland v. N.J. Dept. of Corr.,*

1994 WL 507801, at *5–6 (D.N.J. Sept.14, 1994) (holding, before *Davis,* removal appropriate under All Writs Act in order to avoid conflicting judgments in federal and state court).

Other courts have confronted the issue more directly than the Third Circuit. One example of such a case is the Eighth Circuit's decision in *Xiong v. State,* 195 F.3d 424 (8th Cir.1999). *Xiong* involved a federal desegregation consent decree that prevented a class of school children from relitigating any claims resolved by the decree. *Id.* at 425. After the decree was entered, a class of children brought an action in state court raising claims substantially similar to those addressed in the decree. *Id.* The defendant in the state court action then removed the case, arguing that the federal court had removal jurisdiction under the All Writs Act. *Id.* The district court remanded the case; on appeal, however, the Eighth Circuit reversed, holding that "federal court control of the case" was "necessary to effectuate and prevent the frustration of the earlier federal consent decree." *Id.* at 427. Significantly, the court found removal permissible under the All Writs Act even though the removed claims were based entirely on state law. *See also Canady v. Allstate Ins. Co.,* 282 F.3d 1005, 1013 (8th Cir.2002) (citing *Xiong,* 195 F.3d at 426–27) ("As long as the original lawsuit was properly brought in federal court, the federal court retains subject matter jurisdiction to remove any subsequent state law action to federal court for purposes of applying the All Writs Act.").

In addition to the Eighth Circuit, other courts, including the Second, Sixth, and Seventh Circuits, have approved the exercise of removal jurisdiction based on the All Writs Act.[24] *See Bylinski v. City of*

---

24. The Eleventh Circuit, in holding that the All Writs Act confers no independent jurisdic-

tion, and thus does not support removal jurisdiction, has identified a minority trend. *Hen-*

*Allen Park*, 169 F.3d 1001, 1003 (6th Cir. 1999) (approving removal where state court action posed "imminent threat" to federal consent decree); *Matter of VMS Secs. Litig.*, 103 F.3d 1317, 1324 (7th Cir. 1996) (holding that in context of complex class action litigation "a federal district court may appropriately use the All Writs Act to remove and enjoin the prosecution of subsequent state court claims in order to enforce its ongoing orders against relitigation and to guard the integrity of its prior rulings over which it had expressly retained jurisdiction"); *In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1431 (2d Cir.1993) (quoting *N.Y. Tel. Co.*, 434 U.S. at 172, 98 S.Ct. 364) (explaining that "district court, in exceptional circumstances, may use its All Writs authority to remove an otherwise unremovable state court case in order to 'effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained' "); *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 865 (2d Cir.1988) (holding removal proper under the All Writs Act because removal "necessary to protect the integrity" of a consent decree).

In light of these precedents and the Third Circuit's implicit agreement with the majority trend in *Davis*, this Court concludes that should SEPTA be made a party in any state court action to enforce cost assessments violating SEPTA's statutory exemption, and, thus, the Consent Decree, this Court will be permitted to exercise removal jurisdiction over that action to preserve the effect of the Consent Decree.

PUC's concerns of unmanageable conflicting judgments are thus unfounded and provide no reason for the Court to decline enforcement of the Consent Decree.

## C. RELIEF—SEPTA

For all of the foregoing reasons, the Court will grant SEPTA's Motion to Enforce the Consent Decree. As set forth in the Order attached to this Memorandum, the Court declares that the Consent Decree is a valid and enforceable judgment. The Court also declares that PUC's assessment of costs to SEPTA with respect to the Lloyd Street bridge is in violation of the Consent Decree. The Court will therefore enjoin PUC to take appropriate action consistent with this Memorandum so as to not assess SEPTA costs with respect to the Lloyd Street bridge.

Additionally, the Court has jurisdiction under the All Writs Act to grant relief against parties like Norfolk Southern and the local government entities involved in the Lloyd Street bridge proceedings before PUC "who, though not parties to [this] action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order." *N.Y. Tel. Co.*, 434 U.S. at 174, 98 S.Ct. 364; *see also Pennsylvania v. Porter*, 659 F.2d 306, 325 (3d Cir.1981) ("[T]he All Writs Act authorizes a federal court to compel a nonculpable third party's compliance with a court order."). Accordingly, the Court will enjoin all other parties to the Lloyd Street bridge proceedings—the City of Chester, Delaware County, Norfolk Southern, and PennDOT—from seeking to enforce any PUC order assessing costs to SEPTA with respect to the Lloyd Street bridge.[25]

*son v. Ciba–Geigy Corp.*, 261 F.3d 1065, 1069–70 (11th Cir.2001) (citing *Hillman v. Webley*, 115 F.3d 1461, 1469 (10th Cir.1997); *Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.*, 992 F.2d 932, 937 (9th Cir.1993)). Moreover, some academics have rejected the majority view. *Id.* (citing Joan Steinman, *The Newest Frontier of Judicial Activism: Removal Under the All Writs Act*, 80 B.U. L.Rev. 773

(2000); Lonny Sheinkopf Hoffman, *Removal Jurisdiction and the All Writs Act*, 148 U. Pa. L.Rev. 410 (1999)).

**25.** SEPTA and Amtrak also ask the Court to declare "null and void" the Commonwealth Court's decision in *City of Chester II* to the extent that decision orders or affirms an order assessing costs in violation of the statuto-

## IV. *PUC'S MOTIONS TO DISMISS AMTRAK'S COMPLAINT*

PUC raises several arguments in support of its motions to dismiss Amtrak's Complaint. They are as follows: (1) Amtrak's suit against PUC is barred by Eleventh Amendment sovereign immunity; (2) the Commonwealth Court's decisions bar Amtrak's suit under both principles of full faith and credit and the *Rooker–Feldman* doctrine; (3) Amtrak has failed to join necessary parties; (4) Amtrak has not met the prerequisites of the Declaratory Judgment Act; (5) the Court should abstain from exercising jurisdiction over this case; and (6) PUC Commissioner Aaron Wilson, Jr., is not a proper party to the suit.

The Court finds none of PUC's arguments meritorious. Each argument will be addressed in turn.

### A. ELEVENTH AMENDMENT SOVEREIGN IMMUNITY

The Eleventh Amendment "has been interpreted to make states generally immune from suit by private parties in federal courts." *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503 (3d Cir.2001) ("*MCI*"). PUC argues that the Eleventh Amendment immunizes PUC from Amtrak's suit in two ways: first, that the Amendment prohibits the Court from awarding money judgments against PUC because it is an "arm of the state," and, second, that the Amendment prohibits injunctive and declaratory relief in this case.

PUC's first argument, that it is an "arm of the state," is a nonstarter. It has been rejected no fewer than four times in cases involving Amtrak and PUC. First, in a 1997 decision, Judge Newcomer conducted the three-pronged analysis set forth by the Third Circuit in *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140 (3d Cir.1995), and found that the balance of those factors "is struck against a finding that the Commission is entitled to be protected by the state's cloak of sovereign immunity." *Amtrak V*, 1997 WL 597963, at *10. PUC attempted to reargue the issue on two more occasions, but Judge Newcomer rejected the arguments on the ground that the first decision was preclusive. *Amtrak VII*, 159 F.Supp.2d at 38; *Amtrak VI*, 1998 WL 103377, at *2. Finally, on May 1, 2002, the Third Circuit affirmed Judge Newcomer's ruling that PUC was collaterally estopped from relitigating the sovereign immunity issue. *Amtrak VIII*, 288 F.3d at 532. This Court is therefore bound to follow the Third Circuit's ruling in *Amtrak VIII* that PUC is collaterally estopped from relitigating its "arm of the state" argument.

As to PUC's second argument, that the Eleventh Amendment precludes injunctive and declaratory relief, the Court finds that Amtrak may obtain the declaratory and injunctive relief it seeks against PUC under the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As the Third Circuit

---

ry exemption. In support of this requested relief, SEPTA and Amtrak rely on *In re Diet Drugs*, 282 F.3d at 228, 239. *See* Amtrak Doc. No. 22 at 6–7. The Court concludes, however, that, to the extent it permitted injunctive relief against a state court, *In re Diet Drugs* is distinguishable. In that case, a district court overseeing complex multi-district litigation enjoined ongoing state-court proceedings that threatened a pending class settlement. *See In re Diet Drugs*, 282 F.3d at

239. With respect to the instant cases, the Commonwealth Court has already ruled—there is no pending proceeding that might interfere with proceedings before or orders issued by this Court. Amtrak and SEPTA can thus receive the relief they request by an order directed to the PUC and third parties who could seek enforcement of PUC's cost assessment order. This Court, therefore, does not deem it necessary to declare the Commonwealth Court's May 1, 2002, decision "null and void."

has explained in a recent case that, significantly, involved PUC's claim of sovereign immunity, *Young* allows individual state officers to be sued "in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law." *MCI*, 271 F.3d at 506. This is exactly the relief that Amtrak seeks in the present case.

PUC, however, cites the Supreme Court's decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), as support for its argument that Amtrak may not obtain injunctive relief against PUC. The Third Circuit did acknowledge in *MCI* that *Coeur d'Alene* has caused some "confusion . . . as to the scope and application of *Young*." *MCI*, 271 F.3d at 506. Notwithstanding this confusion, the Third Circuit's analysis of cases decided since *Coeur d'Alene* led it to state that it "continue[s] to view *Young* as generally applicable any time a plaintiff seeks prospective relief against individual state officers from an ongoing violation of federal law." *Id.* at 514.

The general rule of *Young*, however, is subject to two exceptions. The first provides that "[a]n action cannot be maintained under *Young* in those unique and special circumstances in which the suit against the state officer affects a unique or essential attribute of state sovereignty, such that the action must be understood as one against the state." *Id.* at 508 (citing *Coeur d'Alene*, 521 U.S. at 287, 117 S.Ct. 2028). The second provides that "*Young* will not apply where Congress has created a detailed remedial scheme for the enforcement of a federal statutory right against a state." *Id.* (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)).

Taking the exceptions in reverse order, there clearly is no detailed federal remedial scheme at issue in this case, so the second exception does not apply. As for the first exception, the Third Circuit's analysis in *MCI*, finding the exception inapplicable to injunctive and declaratory relief against PUC commissioners is dispositive. There, the court explained that "[t]he ability of a state to make and carry out its regulatory decisions, which would be interrupted by a federal court injunction and declaration that the decision of the PUC Commissioners violated federal law, cannot be viewed as a core or fundamental matter of state sovereignty." *Id.* at 514.

Based on the Third Circuit's *MCI* decision, the Court concludes that Amtrak may pursue the declaratory and injunctive relief it seeks in this case. The Court rejects PUC's Eleventh Amendment argument.

**B. EFFECT OF THE COMMONWEALTH COURT'S JUDGMENTS**

■ PUC next raises two separate arguments with respect to the effect of the Commonwealth Court's decisions in *City of Chester I* and *City of Chester II*. First, PUC argues that this Court must give the Commonwealth Court's decisions preclusive effect under the full faith and credit statute, 28 U.S.C. § 1738. Second, PUC argues that the Court may not hear Amtrak's claims in light of the *Rooker–Feldman* doctrine.[26]

■ The Court has already discussed the principles of claim preclusion embodied in 28 U.S.C. § 1738, *see supra* note 20, and the *Rooker–Feldman* doctrine. *See supra* § III.A. Neither of these doctrines applies to this case because Amtrak was not a

---

26. Because of different procedural postures, PUC's arguments on this issue must be treated differently than the similar arguments raised against SEPTA's Motion to Enforce the Consent Decree. *See supra* § III.A.

party to the *City of Chester* actions. As the Third Circuit has explained, "[t]he basic premise of preclusion is that non-parties to a prior action are not bound." *Valenti v. Mitchell*, 962 F.2d 288, 297 (3d Cir.1992).[27] Given the close "affinity" between preclusion principles and the *Rooker–Feldman* doctrine, that doctrine should, likewise, not be extended to "persons not parties" in the underlying state-court action. *Id.*

Separate and apart from the rule stated in *Valenti*, PUC's arguments must be rejected because they run afoul of the Third Circuit's decision in *Delaware Valley*. In that case, as the Court discussed *supra*, § III.B.1., the Third Circuit ruled that a state court judgment could not nullify a federal judgment if the state court's judgment was entered subsequent to the federal judgment. If PUC's current position were the law, the *Delaware Valley* court would have been required to either give full faith and credit to the state court's judgment nullifying the federal judgment, or decline to exercise jurisdiction over the case on *Rooker–Feldman* grounds. The Third Circuit did not adopt either argument, and with good reason. A rule of law allowing parties displeased with the outcome of a federal court action to challenge the federal judgment in state court would render federal judgments absolutely meaningless. PUC's position would have this unacceptable effect.

For these reasons, the Court rejects PUC's arguments that the Commonwealth Court's decisions require dismissal of Amtrak's Complaint.

## C. FAILURE TO JOIN NECESSARY PARTIES

■ PUC next argues that Amtrak's Complaint should be dismissed because Amtrak failed to join parties who would be impacted by Amtrak's suit—specifically, state and local governmental entities and non-exempt railroads who will be assessed highway bridge costs not assessed to Amtrak. PUC's argument echoes the concerns raised by the Commonwealth Court in its determination that it is not bound by this Court's Consent Decree. *See supra* note 21.

The Court notes that PUC's argument also parrots the arguments it made to this Court in 1999 when it sought to vacate the Consent Decree. The Court concluded then that PUC's arguments lacked merit, *see SEPTA V*, 1999 WL 639946, at *7, and it remains of that opinion.

Although PUC does not mention any authority in support of its argument, it is apparently relying on Fed.R.Civ.P. 19, governing joinder of persons needed for just adjudication of a case. That Rule provides in relevant part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). The two subsections of Fed.R.Civ.P. 19(a) quoted above provide

---

**27.** Amtrak's decision not to intervene in the state-court actions is of no import. *See Valenti*, 962 F.2d at 297. ("A non-party is not precluded from relitigating matters decided in a prior action simply because it passed by an opportunity to intervene.").

for two situations in which a party is "necessary" to just adjudication of a case.

Under Rule 19(a)(1), the Court determines whether complete relief can be accorded "on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought." *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996). In this case, Amtrak seeks injunctive relief against—and only against—PUC, a party to this action. Accordingly, PUC's argument fails under Rule 19(a)(1).

Under Rule 19(a)(2), to demonstrate that a party is necessary, PUC must meet a threshold requirement: the interest held by the allegedly necessary party "must be legally protected, and must be more than a mere financial interest." *Coregis Ins. Co. v. Wheeler*, 180 F.R.D. 280, 283 (E.D.Pa. 1998). PUC has asserted that, should the Court grant Amtrak's requested relief, governmental entities and private railroads will be compelled to pay costs not assessed to Amtrak. This asserted interest can only be described as a financial one—an interest not sufficient to meet the threshold requirement of Rule 19(a)(2).

For these reasons, the Court rejects PUC's argument that Amtrak's Complaint should be dismissed for failure to join necessary parties.

## D. DECLARATORY JUDGMENT ACT REQUIREMENTS

PUC argues that the circumstances of this case are not appropriate for declaratory relief. As support, PUC points to this Court's opinion in *J.J. Smith & Co. v. Carpenter's Mach. Co.*, 1994 WL 108883, at *3 (E.D.Pa. Mar. 30, 1994), which identified five factors a district court should examine in determining whether to dismiss a cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

■ At the outset, the Court notes that the five factors set forth in *J.J. Smith*

do not comprise a hard and fast test. In that case, the Court relied on the Third Circuit's decisions in *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1224 (3d Cir.1989), and *United States v. Pa. Dept. of Envtl. Res.*, 923 F.2d 1071, 1075 (3d Cir.1991). Those decisions reveal, however, that the declaratory judgment analysis varies depending on the circumstances of the case. *See Pa. Dept. of Envtl. Res.*, 923 F.2d at 1077 n. 9.

More recent case law has emphasized that, although the hallmark of a typical federal court determination as to dismissal of a declaratory judgment count is judicial discretion, there are some cases where a district court does "not have open-ended discretion to decline jurisdiction over a declaratory judgment action." *State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 134 (3d Cir.2000) (citing *Pa. Dept. of Envtl. Res.*, 923 F.2d at 1076–79). One type of case in which a federal court has a more definite responsibility to exercise jurisdiction is an action involving federal statutory interpretation. *Id.*

■ Although this case does not technically involve federal statutory interpretation, it is directly related to such a task. Amtrak is seeking in this action a declaration of its rights vis-a-vis PUC under a federal statutory exemption. Of course, Amtrak is not asking this Court to interpret the meaning and scope of the statutory exemption. Rather, it is asking the Court to enforce the Third Circuit's three separate determinations that the exemption precludes PUC from assessing highway bridge costs to Amtrak. Nevertheless, the Court finds enforcement of preclusive federal court judgments involving statutory interpretation no less important than statutory interpretation in the first instance. In light of the Third Circuit's directives, the Court concludes

that it must exercise jurisdiction over Amtrak's declaratory judgment action.

 Even if it did not have a duty to exercise jurisdiction, the Court does not find this an appropriate case for a discretionary dismissal. PUC's arguments to the contrary applying the *J.J. Smith* factors are not convincing.

The factors considered in *J.J. Smith* were: (1) the existence of a state court proceeding involving the same issues and parties; (2) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (3) the convenience of the parties; (4) the public interest in a resolution of an uncertain obligation; and (5) the availability and relative convenience of other remedies. *J.J. Smith,* 1994 WL 108883, at *3. PUC applies these factors by asserting that: (1) this action will be duplicative of the state-court Lloyd Street bridge proceedings; (2) the actions will result in conflicting judgments that, instead of resolving uncertainty, create more uncertainty; (3) the Commonwealth Court has already interpreted the statutory exemption; (4) conflicting judgments are against the public interest; and (5) the state-court action is nearly completed.

The common thread running through PUC's arguments is that this Court should defer to the Commonwealth Court's interpretation of the statutory exemption to avoid conflicting judgments.[28] These arguments appear to assume that this Court is writing on a clean slate—that the scope of Amtrak's statutory exemption is a matter of first impression. That is clearly not the situation. This matter presents an issue that has been litigated in the courts of this district for more than fifteen years. As the Court discusses in other parts of this

Memorandum, *see supra* § III.B., *infra* § V.A., the Third Circuit's decision in *Delaware Valley* dictates that federal courts should prevent state court judgments from rendering federal judgments ineffective. Discretionary dismissal runs directly counter to this directive. In light of this discussion, PUC's arguments may be dispatched summarily.

First, the mere fact that there is parallel litigation does not militate in favor of this Court dismissing the action. In fact, it gives the Court even more reason to hear the case. Second, the Court's doing so will not create uncertainty. Rather, its resolution of the matter will create more certainty by enforcing prior federal judgments. Third, given the policies underlying the decision in *Delaware Valley,* this Court's actions are in the public interest. *See Delaware Valley,* 755 F.2d at 43 (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4468 (1981)) (" 'It would be unthinkable to suggest that state courts should be free to disregard the judgments of federal courts.' "). Finally, the status of state-court actions concerning the Lloyd Street bridge does not eliminate the need for this Court to enforce prior federal court judgments.

For the foregoing reasons, the Court does not find this an appropriate case for discretionary dismissal of Amtrak's declaratory judgment action.

### E. ABSTENTION

PUC argues that the Court should abstain from exercising jurisdiction over this case under each of three abstention doctrines embodied in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Colorado River Water Conserva-*

---

**28.** PUC's argument as to the third factor, "convenience of the parties," is a misinterpretation of *J.J. Smith.* In that case, the Court made clear that the relevant focus is the prox-imity of the forum. *J.J. Smith,* 1994 WL 108883, at *5. Because PUC has offices located in Philadelphia, where this Court is located, this issue is irrelevant.

tion Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); and Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

With respect to *Burford*, PUC is merely repeating arguments raised in the SEPTA litigation before Judge Pollak. Although Amtrak was not a party to that litigation, the issues now before the Court are indistinguishable. "*Burford* abstention is appropriate where federal review of state administrative proceedings would have a 'disruptive effect on state policy.'" *Cohen v. Township of Cheltenham*, 174 F.Supp.2d 307, 317 (E.D.Pa.2001) (quoting *Colorado River*, 424 U.S. at 815, 96 S.Ct. 1236). As Judge Pollak concluded upon analyzing PUC's *Burford* claim in the SEPTA litigation, "any disruptive effect on state policy in these cases would flow from a federal legislative design rather than from federal judicial oversight of issues of distinctive local concern." *SEPTA IV*, 826 F.Supp. at 1514. Accordingly, Judge Pollak wrote, "it would be manifestly inappropriate to abstain" given the lack of any conflict with state policy. *Id.* The Court concurs with Judge Pollak's analysis and concludes that *Burford* abstention is indeed "manifestly inappropriate" in this case. *Id.*

As to PUC's *Colorado River* argument,[29] that doctrine requires abstention only in "extremely limited circumstances in which a federal court may defer to pending state court proceedings based on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Ryan v. Johnson*, 115 F.3d 193, 195 (3d Cir.1997) (quoting *Colo-*

rado River, 424 U.S. at 817, 96 S.Ct. 1236). PUC points to three factors in support of *Colorado River* abstention: (1) inconvenience of the federal forum; (2) avoiding piecemeal litigation; and (3) the order in which jurisdiction was obtained. *Cf. id.* at 196 (citing *Colorado River*, 424 U.S. at 818–19, 96 S.Ct. 1236) (identifying four factors).

PUC does not explain how a federal forum is inconvenient, and the Court does not find any basis for that conclusion. As to the second and third factors, the Court finds them unpersuasive. Mindful of the fact that "the presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction, *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court agrees with Amtrak's emphasis on the nature of this proceeding: enforcing a *federal* court's interpretation of a *federal* statutory provision.[30] The fact that the Commonwealth Court has ruled on cost assessments with respect to the Lloyd Street bridge and that this proceeding commenced before Amtrak filed its complaint in this Court does not change the circumstances. In reality, as Amtrak asserts, the issues presented in this case were first decided in a federal court fifteen years ago. Amtrak's current efforts to enforce those prior federal decisions implicate important federal interests, *see Delaware Valley*, 755 F.2d at 43 (citing and discussing 28 U.S.C. § 1738), weighty interests that compel the Court not to abstain under *Colorado River*.

Turning, finally, to *Younger* abstention, PUC asserts that the Court

---

**29.** Judge Pollak also rejected PUC's *Colorado River* abstention arguments. *SEPTA IV*, 826 F.Supp. at 1514–16. That case presented a different procedural posture than does the present one, thus preventing the Court from relying on Judge Pollak's analysis.

**30.** The Court also notes that federal statutory law confers federal jurisdiction on all actions brought by Amtrak under 28 U.S.C. § 1349.

should decline to exercise jurisdiction because there are ongoing state proceedings involving Amtrak, which implicate important state interests and provide an adequate opportunity to litigate the federal statutory exemption. This argument, however, distorts the requirements for *Younger* abstention. As the Third Circuit has explicitly stated, *Younger* abstention is only appropriate when there is "an ongoing state judicial proceeding *to which the federal plaintiff is a party* and with which the federal proceeding will interfere." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 843 (3d Cir. 1996) (emphasis added). As PUC admits, Amtrak is not a party in any state-court proceedings. For this reason, the Court will not abstain under *Younger*.

### F. INJUNCTIVE RELIEF AGAINST PUC COMMISSIONER AARON WILSON, JR.

In a separate motion, defendant PUC Commissioner Aaron Wilson, Jr., argues that Amtrak's Complaint must be dismissed to the extent that it seeks injunctive relief against him. The asserted ground for this argument is that Commissioner Wilson, the former mayor of the City of Chester, recused himself from all PUC proceedings involving the Lloyd Street bridge. Because Commissioner Wilson did not vote to assess costs to Amtrak for the Lloyd Street bridge, PUC argues, Amtrak does not have standing to obtain injunctive relief against him.

 PUC correctly notes the three elements of standing under Article III of the Constitution: injury-in-fact, causation, and redressability. *See AT & T Communications of N.J., Inc. v. Verizon N.J., Inc.*, 270 F.3d 162, 170 (3d Cir.2001). PUC's argument apparently goes to the second element of the standing inquiry, causation. In making this argument, however, PUC cites no authority to suggest that an individual defendant can avoid an injunction by declining to participate in a decision. Nor does the Court's research reveal any such authority.

 The Court finds PUC's position an unnecessarily narrow application of standing doctrine. As Amtrak argues, the injunctive relief sought here involves *future* action by individual PUC Commissioners. PUC does not allege, nor can it, that Commissioner Wilson will refrain from voting to assess costs against Amtrak in future cases. Moreover, the Court agrees with Amtrak's assertion that the actions of the PUC as a whole are properly attributed to Commissioner Wilson. For these reasons, the Court concludes that Amtrak may properly obtain injunctive relief against Commissioner Wilson.

### G. DISPOSITION OF PUC MOTIONS

For the foregoing reasons, the Court rejects PUC's arguments in support of its Motions to Dismiss Amtrak's Complaint. The Court therefore denies PUC's Motions to Dismiss.

### V. *AMTRAK'S MOTIONS FOR DECLARATORY AND INJUNCTIVE RELIEF*

In its Motions for Declaratory and Injunctive Relief, Amtrak asks the Court to: (1) enjoin PUC from assessing costs for maintenance and construction of the Lloyd Street bridge; (2) enjoin PUC from assessing costs for maintenance and construction of any highway bridge in the Commonwealth of Pennsylvania; and (3) enjoin PUC from implementing or enforcing any order requiring such an assessment.[31]

---

31. Amtrak has statutory authority to enforce its exemption. 49 U.S.C. § 24301(*l*)(2) ("The

district courts of the United States have origi-

■ At the outset, the Court notes some inconsistencies in the scope of relief requested by Amtrak. Amtrak's Complaint and Motion for Preliminary and Other Injunctive Relief sought an injunction as to all highway bridges in Pennsylvania. At oral argument, however, Amtrak submitted to the Court a revised proposed Order, which omits any request for injunctive relief with respect to highway bridges other than the Lloyd Street bridge. Amtrak's recently submitted Renewed Motion for Declaratory and Injunctive Relief, however, once again requests broader relief as to all highway bridges in Pennsylvania. At this preliminary stage of the proceedings, in view of the inconsistent claims for relief asserted by Amtrak, the Court will consider only the narrowest of the requests—the request limited to the Lloyd Street bridge.[32] In so doing, the Court notes that the record before the Court does not reveal any PUC assessment orders violating the statutory exemption with respect to bridges other than the Lloyd Street bridge.

■ Additionally, the Court notes that it must treat the present motion as one for preliminary injunctive relief. It does so notwithstanding counsel for Amtrak's representations at oral argument that Amtrak did not intend to present any evidence in a hearing and notwithstanding Amtrak's revised proposed order, which is phrased in terms of permanent injunctive relief. The Court declines to grant permanent injunctive relief because it did not notify the parties that it intended to consolidate a preliminary injunction hearing with a trial on the merits as required by Fed.R.Civ.P. 65(a)(2). "[A] district court should not consolidate a hearing for preliminary relief with a trial on the merits unless the court has given both parties 'clear and unambiguous notice' of its intent to do so." *Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir.1997) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Because the Court did not provide such notice, it may not grant any relief in the form of a permanent injunction. *See ReMed Recovery Care Ctrs. v. Township of Willistown*, 36 F.Supp.2d 676, 682 (E.D.Pa.1999) (treating injunction as preliminary in nature in light of omitted notice notwithstanding intent expressed to parties to grant permanent injunction).

For this reason, the Court must conduct the traditional analysis to evaluate whether Amtrak is entitled to preliminary injunctive relief. The four factors to be considered are: (1) whether Amtrak has demonstrated a reasonable probability of success on the merits; (2) whether Amtrak will suffer irreparable harm should the Court deny relief; (3) whether granting preliminary relief will result in even greater harm to PUC; and (4) whether granting the requested relief behooves the public interest. *ACLU v. Reno*, 217 F.3d 162, 172 (3d Cir.2000); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). The Court considers each factor in turn.

nal jurisdiction over a civil action Amtrak brings to enforce this subsection and may grant equitable or declaratory relief requested by Amtrak.").

**32.** For purposes of further proceedings, the Court notes that district courts "have the power to enjoin related unlawful acts which may fairly be anticipated from the defendants' conduct in the past." *United States v. Spectro Foods, Corp.*, 544 F.2d 1175, 1180 (3d Cir. 1976); *see also Gen. Instrument Corp. of Del. v. Nu–Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 89–91 (3d Cir.1999) (finding, in cable theft case, no abuse of discretion in district court's broad injunction prohibiting "further cable theft").

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

 Amtrak is requesting relief on the grounds stated in Count III of its Complaint—that, in light of the Third Circuit's decision in *Amtrak II*, PUC is collaterally estopped from litigating the merits concerning the scope of Amtrak's statutory exemption. Amtrak advances reasoning essentially the same as that employed in SEPTA' Motion to Enforce the Consent Decree: A federal court has issued a final judgment holding Amtrak statutorily exempt from costs like those PUC has assessed with respect to the Lloyd Street bridge. The Commonwealth Court's contrary interpretation of the statutory exemption, PUC's order assessing costs to Amtrak, and the Commonwealth Court's subsequent affirmance of the PUC order thus constitute an impermissible collateral attack on a federal judgment.

The Court finds Amtrak's argument a meritorious one under the Third Circuit's decision in *Delaware Valley* for the same reasons set forth with respect to SEPTA's Motion to Enforce the Consent Decree, *see supra,* § III.B, which reasoning the Court hereby incorporates, but does not repeat, in its consideration of Amtrak's Motions for Declaratory and Injunctive Relief. In so ruling, the Court notes that, although there are shades of difference between Amtrak's case and SEPTA's case,[33] the differences do not render inapplicable the relitigation exception to the Anti–Injunction Act. " 'The relitigation exception was designed to permit a federal court to prevent state litigation of an *issue* that previously was presented to, and decided by, the federal court.' " *In re Prudential,* 261 F.3d at 364 (quoting *Chick Kam Choo,* 486 U.S. at 147, 108 S.Ct. 1684) (emphasis added). Thus, because the exception " 'is founded in the well-recognized concepts of res judicata and collateral estoppel,' " to obtain the injunction it seeks, Amtrak need only meet the " 'essential prerequisite' " of showing that " 'the claims or issues which the federal injunction insulates from litigation in state proceedings' " were actually decided by the federal court. *In re Prudential,* 261 F.3d at 364 (quoting *Chick Kam Choo,* 486 U.S. at 147–48, 108 S.Ct. 1684); *see also Delaware Valley,* 755 F.2d at 42 (finding that state court's action "[flew] in the face of settled law and the doctrine of *res judicata* ").

Although Amtrak cannot rely on a Consent Decree directly covering the Lloyd Street bridge assessments, it can show that the scope of the statutory exemption was finally decided by a federal court.[34] Accordingly, assuming Amtrak can establish collateral estoppel as to PUC, it would be entitled to injunctive relief against PUC. The Court now turns to an analysis of the elements of Amtrak's collateral estoppel claim.

To collaterally estop PUC from relitigating the statutory exemption issue, Amtrak must show: (1) the identical issue was

---

**33.** Amtrak, of course, is not a party to a Consent Decree governing the PUC assessments with respect to the Lloyd Street bridge. Nor does Amtrak have any judgment in its favor explicitly covering the Lloyd Street bridge. Whereas SEPTA has sought to enforce a judgment that covered the Lloyd Street bridge, Amtrak is seeking to apply a prior judgment to cover that bridge.

**34.** The Commonwealth Court's evaluation of the statutory exemption on the merits in *City*

of *Chester I* is irrelevant to the Court's analysis. The question presented in this case is the enforceability of a federal court judgment. Under *Delaware Valley,* state court judgments conflicting with previously adjudicated federal court judgments are not binding. The Court therefore rejects all of PUC's arguments, repeated from PUC's opposition to SEPTA's Motion to Enforce the Consent Decree, that the Court should give "deference" to the Commonwealth Court's decisions.

adjudicated in the prior action; (2) that issue was actually litigated; (3) the prior adjudication was necessary to the decision; and (4) the party precluded from relitigating the issue was fully represented in originally litigating the issue. *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir.2001); *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir.1995).

Turning, first, to the question of identical issues, Amtrak argues that PUC's assessment of costs conflicts directly with the Third Circuit's interpretation of the statutory exemption in *Amtrak II*. In that case, the court considered the issue of "whether the phrase 'any taxes or other fees' contained in th[e] statute covers charges of the nature levied against Amtrak for building and maintaining the Cassatt Avenue bridge." *Amtrak II*, 848 F.2d at 438. The court ultimately held "that Amtrak's immunity from local 'taxes or other fees'... extends to assessments for local improvements of the kind at issue here." *Id.* at 440. Amtrak argues that the Third Circuit's determination should be viewed generally—that is, when referring to "assessments for local improvements of the kind at issue here," the court effectively concluded that the statutory exemption immunized Amtrak from payment of *any* kind of highway bridge costs, including, of course, the assessments with respect to the Lloyd Street bridge.

The Court agrees with Amtrak's argument. There is nothing in the Third Circuit's opinion, despite PUC's arguments to the contrary, suggesting that the court was qualifying its decision by limiting it to the specific bridge at issue, the Cassatt Avenue bridge.[35]

PUC's attempt to redefine the issue in this case is unconvincing. Asserting that the central issue for collateral estoppel purposes is whether Amtrak is entitled to injunctive relief from a PUC order required by the Commonwealth Court, PUC argues that the Third Circuit did not consider this issue in *Amtrak II*. PUC's argument that this question is *the* "issue" for the Court to analyze in a collateral estoppel analysis is simply incorrect. The issue on which the Court must focus is the one that Amtrak seeks to prevent PUC from relitigating. That issue is the applicability of Amtrak's statutory exemption.

The only question for purposes of the same-issues analysis, then, is whether the costs PUC has assessed might be distinguishable from the assessments the Third Circuit considered in *Amtrak II*. Upon its review of the record, the Court does not find any basis for such a distinction.

Norfolk Southern's argument in its response to Amtrak's motion [36] that this case indeed raises cost assessments different from those considered by the Third Circuit does not change the Court's conclusion. Norfolk Southern argues that, should the Court grant Amtrak's requested relief, PUC would be prevented from assessing Amtrak costs for flagmen [37] and adjust-

---

**35.** Judge Newcomer's opinion was similarly broad in its conclusion that the statute "exempts Amtrak from the payment of special assessments such as that imposed by PUC." *Amtrak I*, 665 F.Supp. at 412.

**36.** Norfolk Southern filed responsive papers so that, in the event the Court granted its motions to intervene, the Court could consider those papers in its disposition of the pending motions. Even though the Court has denied Norfolk Southern's motions to intervene, the Court considers the argument advanced

here (which PUC has not advanced), because it raises a significant point about the appropriate scope of injunctive relief.

**37.** Flagmen are workers who direct traffic when maintenance or construction is performed on a highway bridge. Norfolk Southern asserted at oral argument that Amtrak, as the owner of the tracks under the Lloyd Street bridge, should be responsible for flagmen during any construction on that bridge. *See* Jan. 11, 2002, Hr'g Tr. at 83–84.

ments to Amtrak-owned track facilities. These costs, Norfolk Southern asserts, are part of Amtrak's own operating expenses. Because the statutory exemption was not intended "to exempt Amtrak from the payment of fees for services used," H.R.Rep. No. 97–81, at 21 (1981), and because neither the Third Circuit in *Amtrak II,* nor any other court has adjudicated this issue, Norfolk Southern argues, PUC should be permitted to assess costs to Amtrak for these expenses.

The Court concludes that Norfolk Southern's point is irrelevant to the same-issues analysis; rather, it concerns the proper scope of injunctive relief. Counsel for Amtrak emphasized at oral argument that Amtrak "is not seeking to be relieved from the costs of maintaining any of its own railroad facilities," Jan. 11, 2002, Hr'g Tr. at 61, and Amtrak's revised proposed Order, submitted at oral argument, specifically states that the injunction should not cover those costs. Because Amtrak is not seeking injunctive relief with respect to the costs which Norfolk Southern argues distinguish this case from *Amtrak II,* there is no basis for Norfolk Southern's argument that Amtrak fails the same-issues test of the collateral estoppel analysis.

Turning to the remaining elements of the collateral estoppel inquiry, Amtrak clearly meets the requirements. There is no doubt that the issue was actually litigated or that the adjudication was necessary to the decision. In fact, the only issue litigated and adjudicated was "whether the phrase 'any taxes or other fees' contained in th[e] statute covers charges of the nature levied against Amtrak for building and maintaining the Cassatt Avenue bridge." *Amtrak II,* 848 F.2d at 438. Finally, PUC, the party Amtrak seeks to preclude from relitigating that issue was a party in *Amtrak II,* and thus, by definition, fully represented in originally litigating the issue.

Amtrak has thus shown a reasonable probability that it will successfully establish a collateral estoppel claim. Because Amtrak will likely be able to show that PUC is collaterally estopped from relitigating the scope of the statutory exemption, Amtrak has, likewise, shown a reasonable probability that it will successfully establish that PUC may not assess to Amtrak highway bridge costs with respect to the Lloyd Street bridge.

## B. IRREPARABLE HARM TO AMTRAK

 The parties devote much of their briefing to the question of whether Amtrak must demonstrate irreparable harm as a prerequisite for the Court to issue an injunction. Amtrak argues that because it has alleged a violation of a statute, and, concomitantly, has demonstrated a likelihood of success in proving that violation via a collateral estoppel analysis, it need not show irreparable harm. Amtrak supports this argument by citing *Government of Virgin Islands v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir.1983), where the Third Circuit stated that "courts may grant preliminary equitable relief on a showing of a statutory violation without requiring any additional showing of irreparable harm." As another court has explained, "irreparable injury must be presumed in a statutory enforcement action," because the passage of a statute "is, in a sense, an implied finding that violations [of that statute] will harm the public and ought to be restrained if necessary." *United States v. Richlyn Labs., Inc.,* 827 F.Supp. 1145, 1150 (E.D.Pa.1992).

This relaxed burden in a statutory violation case has, however, been called into question. Several years after *Virgin Islands,* the Third Circuit implicitly held that a party seeking injunctive relief must always demonstrate irreparable harm,

stating that a "district court may issue a permanent injunction ... *only* after a showing both of irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *Natural Res. Def. Council v. Texaco Ref. and Mktg., Inc.*, 906 F.2d 934, 941 (3d Cir.1990) (emphasis added). In a subsequent decision, the Third Circuit again implicitly held in a statutory violation case that the relaxation of the irreparable harm requirement is only applicable to some statutes. *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 400 (3d Cir.1991) (requiring irreparable harm analysis for injunction under ERISA). The Third Circuit thereafter recognized the split of authority over whether a party must show irreparable harm in a statutory violation case, but declined to settle the issue, *Temple Univ. v. White*, 941 F.2d 201, 213 n. 18, 214 (3d Cir.1991), and it is still an open question. *See N.J. Payphone Ass'n, Inc. v. Town of West New York*, 130 F.Supp.2d 631, 640 (D.N.J.2001) (citing *Temple Univ.*, 941 F.2d at 213) (noting that, since *Temple Univ.* decision, "the Third Circuit has not spoken on whether irreparable injury is necessary for a permanent injunction"). Some courts have, however, continued to apply the relaxed standard. *See ReMed Recovery Care Ctrs. v. Township of Willistown*, 36 F.Supp.2d 676, 688 (E.D.Pa.1999) (concluding that violation of the Fair Housing Amendments Act "creates a presumption of irreparable harm that defendant must rebut in order for a preliminary injunction not to issue").

The Court finds convincing the logic of those cases applying a relaxed standard for issuing injunctions upon a showing of a statutory violation. Nevertheless, in light of conflicting authority as to the proper standard, the Court will proceed with the traditional irreparable harm analysis.

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989); *see also Binney & Smith v. Rose Art Indus.*, No. 00–2939, 2001 WL 910943, at *2 (E.D.Pa. Aug. 9, 2001). Importantly, "loss of income alone" generally does not "constitute[ ] irreparable harm." *Instant Air Freight*, 882 F.2d at 801 (quoting *Morton v. Beyer*, 822 F.2d 364 (3d Cir.1987)). Nevertheless, a "crucial issue" in evaluating whether the party seeking injunctive relief has demonstrated irreparable harm "is the question of whether money damages provide an adequate remedy at law." *Id.*

Amtrak asserts that, should the Court decline to issue an injunction, it will be harmed by being forced to divert resources toward paying PUC's ordered assessments. The Court also notes that, without injunctive relief, Amtrak will likely be burdened with future litigation in defense of its statutory exemption. This future burden might, in and of itself, constitute irreparable harm; one court has specifically ruled that "a party suffers irreparable harm when it is required to relitigate in state court issues previously decided in federal court." *Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1020 (8th Cir.2002) (citing *In re SDDS, Inc.*, 97 F.3d 1030, 1040 (8th Cir.1996)).

Although the Third Circuit has not so held, the Court finds this conclusion a sound one. The focus of the irreparable harm inquiry is whether Amtrak has available an *adequate* remedy at law. If the Court were to deny Amtrak's requested relief, Amtrak would be compelled to either pay PUC's ordered costs or decline to pay those costs and defend a state-court enforcement action. If Amtrak were to comply with PUC's order, its remedy would be a damages action in either a state

court or a federal court. If Amtrak should prevail in such an action, it would be a short-lived victory, as, given the long history of litigation concerning Amtrak's statutory exemption, and the Commonwealth Court's rejection of final federal court judgments, PUC would not be barred from assessing to Amtrak further costs for the Lloyd Street bridge. On the other hand, if Amtrak were to decline to pay the assessed costs, it would expose itself to further litigation in state court.

The Court finds that the effect of denying injunctive relief—a continuing cycle of litigation and/or continuing PUC assessments in violation of the statutory exemption—compels the conclusion that Amtrak has no adequate remedy at law. Accordingly, the Court concludes that, in light of the likely continued assessment of highway bridge costs to Amtrak in violation of the statutory exemption requiring relitigation of a finally decided issue, Amtrak would be irreparably harmed by this Court's denial of injunctive relief.

### C. HARM TO PUC

Unlike Amtrak, PUC will experience only minimal harm should the Court issue injunctive relief. PUC will not be prevented from fulfilling its duty to ensure that highway bridges are well maintained as it may conform with the Court's injunction by reassessing costs to other non-exempt parties benefitting from the Lloyd Street bridge.[38] The only foreseeable "harm" that PUC might face is the difficult situation of being subject to two conflicting orders. As stated throughout this Memorandum, such a conflict does not relieve the Court of its duty to enforce final federal court judgments. Moreover, the Court will be able to resolve any conflicts via exercise of its removal jurisdiction. *See*

*supra* § III.B.2.c. The Court therefore finds no harm to PUC that counsels against granting Amtrak's requested injunctive relief.

### D. PUBLIC INTEREST

Should the Court grant Amtrak's requested injunction, other parties will certainly be affected by PUC's reassessment of costs currently assessed to Amtrak. Despite PUC's argument before the Court (and the Commonwealth Court's assertions in its opinions interpreting the statutory exemption) that this harms the public interest, Congress has determined to the contrary.

As this Court explained in its 1999 opinion refusing to vacate the SEPTA Consent Decree, Congress enacted a statutory exemption for Amtrak (and, subsequently, SEPTA) in light of Amtrak's severe financial troubles. *SEPTA V*, 1999 WL 639946, at *1. Much of that financial trouble arose from Amtrak's payment of taxes and costs to state and local governments. Based on the Secretary of Transportation's conclusion that Amtrak would pay more than $14 million in taxes to state and local governments during one year, the U.S. Senate Appropriations Committee found that federal subsidies to Amtrak were essentially resulting in "tax windfalls to states and localities." *Amtrak II*, 848 F.2d at 438 (citing S.Rep. No. 97–253, at 103 (1981)). A subsequent Senate committee investigation led to a conclusion that "there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service." *Id.* (quoting S.Rep. No. 97–516, at 170 (1982)). These quotations demonstrate that it is the explicit policy of the United States Con-

---

**38.** In this case, PUC found that three non-exempt parties benefitted from the Lloyd Street bridge: Norfolk Southern, Delaware County, and PennDOT. *See* PUC Opinion and Order, at 22.

gress to utilize federal funds to provide nation-wide intercity rail service. In return for the important services provided with federal dollars, state and local governments, whose constituents benefit from those services, are charged with the relatively small responsibility of funding improvements for which Amtrak might otherwise be responsible under state or local law.

The Third Circuit and district courts in this Circuit have interpreted the statute implementing this explicit policy to exempt Amtrak from the payment of highway bridge maintenance costs—like those at issue in the underlying Lloyd Street bridge proceedings. The fact that Amtrak's requested relief would provide exactly the result sought by congressional policy confirms that the Court's issuance of an injunction would be in the public interest.

As a final note in consideration of the public interest, the Court rejects any suggestion by PUC that granting Amtrak's requested relief will harm public safety by preventing proper maintenance of highway bridges. PUC, through its authority to reassess costs to nonexempt parties, can ensure that such maintenance is funded. Injunctive relief for Amtrak will not have any effect on PUC's authority in this regard.

### E. RELIEF—AMTRAK

The foregoing analysis demonstrates that Amtrak is entitled to preliminary injunctive relief. Amtrak has demonstrated a strong probability of success on the merits by showing that the Third Circuit's judgment in *Amtrak II* as to the scope of the statutory exemption will have collateral estoppel effect on PUC. Denial of injunctive relief will irreparably harm Amtrak by allowing a continuing cycle of litigation and assessments violative of the statutory exemption. Issuance

of an injunction will not harm PUC. Enjoining PUC's assessments conforms with well-established congressional policy, and, therefore, is in the public interest.

Accordingly, the Court grants the preliminary injunctive relief sought by Amtrak with respect to the Lloyd Street bridge. That is the only bridge as to which the record reflects PUC assessments to Amtrak in violation of the statutory exemption. The Court will address Amtrak's requested relief from further assessments with respect to other bridges at a later stage of this proceeding.

Finally, the Court notes that, as previously discussed, *see supra* § III.C., the statute authorizing the Court's injunction, the All Writs Act, permits the Court to frame its injunction so as to enjoin all other parties to the Lloyd Street bridge proceedings—the City of Chester, Delaware County, Norfolk Southern, and PennDOT—from seeking to enforce any PUC order assessing costs to Amtrak with respect to the Lloyd Street bridge.

### VI. CONCLUSION

For the foregoing reasons, the Court will: (1) deny Norfolk Southern's Motions to Intervene in both the SEPTA case and the Amtrak case; (2) grant SEPTA's Motion to Enforce the Consent Decree; (3) deny PUC's two Motions to Dismiss Amtrak's Complaint; and (4) grant in part and deny in part Amtrak's Motions for Declaratory and Injunctive Relief.

An appropriate order follows.

### ORDER

**AND NOW,** this 12th day of July, 2002, upon consideration of Norfolk Southern Railway Company's ("Norfolk Southern") Motion to Intervene as Intervenor/Defendant (No. 95–4500, Doc. No. 24, filed December 4, 2001); Norfolk Southern's Motion to Intervene as Intervenor/Defendant

and Supporting Memorandum of Law (No. 01–5570, Doc. Nos. 8 and 9, filed December 21, 2001); Motion of Southeastern Pennsylvania Transportation Authority ("SEPTA") to Enforce the Consent Decree and Supporting Memorandum of Law (No. 95–4500, Doc. Nos. 20 and 21, filed October 23, 2001); Motion of the Pennsylvania Public Utility Commission ("PUC") and All Named Individual Defendants to Dismiss the Verified Complaint in Equity filed by Amtrak (No. 01–5570, Doc. No. 6, filed December 18, 2001); Motion of Commissioner Aaron Wilson, Jr., to Dismiss the Verified Complaint in Equity filed by Amtrak (No. 01–5570, Doc. No. 7, filed December 18, 2001); Motion of National Railroad Passenger Corporation ("Amtrak") for Preliminary and Other Injunctive Relief (No. 01–5570, Doc. No. 12, filed January 2, 2002); Amtrak's Renewed Motion for Declaratory Judgment and for Preliminary Injunctive Relief (No. 01–5570, Doc. No. 22, filed May 8, 2002); all related filings; and oral argument held January 11, 2002, for the reasons stated in the foregoing Memorandum, **IT IS ORDERED** as follows:

1. Norfolk Southern's Motion to Intervene in the SEPTA case (No. 95–4500, Doc. No. 24) is **DENIED;**

2. Norfolk Southern's Motion to Intervene in the Amtrak case (No. 01–5570, Doc. Nos.8, 9) is **DENIED;**

3. The Motion of PUC and All Named Individual Defendants to Dismiss the Verified Complaint in Equity filed by Amtrak (No. 01–5570, Doc. No. 6) is **DENIED;**

4. The Motion of Commissioner Aaron Wilson, Jr., to Dismiss the Verified Complaint in Equity filed by Amtrak (No. 01–5570, Doc. No. 7) is **DENIED;**

5. SEPTA's Motion to Enforce the Consent Decree (No. 95–4500, Doc. Nos.20, 21) is **GRANTED** as follows:

(a) The Court hereby **DECLARES** that the Consent Decree (No. 95–4500, Doc. No. 10, filed January 22, 1996) ("Consent Decree"), as modified, is a valid and enforceable judgment of this Court that prohibits PUC from assessing upon SEPTA any "Assessed Cost or Responsibility" as defined in Paragraph No. 1 of the Consent Decree;

(b) To the extent that PUC's September 7, 2001, Opinion and Order (PUC Docket No. I–00970070) purports to assess upon SEPTA any "Assessed Cost or Responsibility" with respect to the Lloyd Street bridge in Chester, Pennsylvania, the Court hereby **DECLARES** that PUC's Opinion and Order violates the Consent Decree;

(c) In accordance with the Consent Decree, PUC and its individual commissioners are **ENJOINED** to take appropriate action consistent with the foregoing Memorandum so as to not assess to SEPTA any Assessed Costs or Responsibilities with respect to the Lloyd Street bridge;

(d) The parties to the PUC proceedings concerning the Lloyd Street bridge, the City of Chester, Delaware County, Norfolk Southern, and PennDOT, are **ENJOINED** from pursuing, enforcing, or seeking to enforce any judicial or administrative order that would result in assessment of costs to SEPTA with respect to the Lloyd Street bridge.

6. Amtrak's Motion for Preliminary and Other Injunctive Relief (No. 01–5570, Doc. No. 12) and Amtrak's Renewed Motion for Declaratory Judgment and for Preliminary Injunctive Relief (No. 01–5570, Doc. No. 22) are **GRANTED IN PART** and **DENIED IN PART** as follows:

(a) The Court hereby **PRELIMINARILY ENJOINS** PUC and its individual commissioners from (i) assessing to Amtrak costs and responsibilities (including costs for design, construction, demolition,

reconstruction, inspection, maintenance, removal of snow, ice, debris or graffiti, or repair of any component)[1] for the Lloyd Street bridge (which "bridge" includes, without limitation, approaches, substructures and superstructures, highway decking, railings, walls, fences, stairways and ramps attached to the bridge, lighting, drainage and signage)[2]; and (ii) relitigating in the courts of the Commonwealth of Pennsylvania, or any other court, with the exception of a proper appeal from this Order, the issue conclusively decided in *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 848 F.2d 436 (3d Cir.1988), as to the Lloyd Street bridge;

(b) The parties to the PUC proceedings concerning the Lloyd Street bridge, the City of Chester, Delaware County, Norfolk Southern, and PennDOT, are **PRELIMINARILY ENJOINED** from pursuing, enforcing, or seeking to enforce any judicial or administrative order that would result in assessment of costs to Amtrak with respect to the Lloyd Street bridge;

(c) To the extent Amtrak seeks permanent injunctive relief and declaratory relief in its Motions for Declaratory and Injunctive Relief, those Motions are **DENIED WITHOUT PREJUDICE** to Amtrak's right to seek permanent injunctive relief and declaratory relief at a later stage of this proceeding;

(d) To the extent that Amtrak seeks relief in its Motions for Declaratory and Injunctive Relief with respect to bridges in the Commonwealth of Pennsylvania other than the Lloyd Street bridge, those Motions are **DENIED WITHOUT PREJUDICE** to Amtrak's right to seek such relief at a later stage of this proceeding;

(e) Nothing in this Order shall be construed as relieving Amtrak of responsibility to pay for its own facilities and/or operations;

(f) A trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2) will be scheduled in due course.

**IT IS FURTHER ORDERED** that counsel for PUC, within three (3) business days of service of the foregoing Memorandum and this Order, shall serve copies of the Memorandum and Order on all parties to PUC's Lloyd Street bridge proceedings which are not parties of record in the instant cases—the City of Chester, Delaware County, and PennDOT.

**IT IS FURTHER ORDERED** that a Preliminary Pretrial Conference in the Amtrak Case, No. 01–5570, is scheduled for Monday, July 29, 2002, at 4:45 p.m. The Conference will be held in Chambers: Room 12613, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania.

---

**1.** The Court's further references to "costs" in Paragraph 6 of this Order incorporate this definition.

**2.** The Court's further references to the "Lloyd Street bridge" in Paragraph 6 of this Order incorporate this definition.